Argued October 9; affirmed October 15; rehearing denied
November 13, 1935

## GROSZ *v.* GROSZ

(50 P. (2d) 119)

*George Estes,* of Portland, for appellant.

*F. E. Swope,* of Portland, for respondent.

ROSSMAN, J. A statement of the facts will facilitate an understanding of the assignments of error advanced by the defendant-appellant, John G. Grosz, who is the father of the plaintiff. February 25, 1924, when the plaintiff was 18 years of age, his father obtained from the defendant life insurance company a 20-pay life policy of insurance in the denomination of $5,000 upon the life of the plaintiff. The annual premiums were $158.90. A monthly disability payment of $50 was payable to the insured in the event he became totally and permanently disabled before reaching the age of 60. The policy designated the father as the beneficiary and the son as the insured. It reserved to the insured the power to change the beneficiary or to assign the policy. At the time that the father obtained this policy he was in prosperous financial circumstances. About the same time he obtained another policy upon the life of his son in the denomination of $2,500, naming the mother as the beneficiary. Apparently the father permitted that policy to lapse. At any rate, this suit does not concern it.

The son testified that the father gave the following reasons for procuring the $5,000 policy: "He told me he had been discussing it with Mr. Goodwin and they decided at my age that it would be an excellent time to take out this policy, because when I would be 38 years old it would be paid up and I would have something really worth while, as well as having it for my protection in case I became sick. He really took it out for my benefit." He added: "He told me he wanted to take it out for me and that he would pay the premiums until such a time until I had finished my school and was established and could take care of the premiums myself." Defendant's daughter, referring to her father and brother, testified: "He knew he was a good boy

and some day would be in business or something, and took out the policy for my brother's benefit so that when he was 37 or 38 years old, if he needed some funds, he would have a nestegg." Defendant's wife gave the following explanation: "Mr. Grosz took it out for Walter when he was in his 18th year and so that later if he was in business or anything it would be a help for him, and he (the father) was to pay the premiums and take care of it until the boy was capable and able to take care of this himself."

These accounts of the circumstances which caused the father to obtain the policy were contradicted by no one. The defendant referred to this incident in the following words only: "I took out a $5,000 policy for him. * * * I took those policies out for his benefit as well as my own." Shortly after the policy was obtained the plaintiff became a student at a college. In April of 1927, two months after he had reached the age of 21, and when he was still a student, his father said to the plaintiff, according to the latter, "that as soon as I had become of age I had a right to name the beneficiary as well as having control of the policy, and in view of the fact that I was down at school he seemed to think because I was in a fraternity house probably I might want to borrow some money on it, or get some idea that I might want to buy a car and he talked for my protection to have it so the policy would not lapse, he suggested that I turn it over to him until such a time as I had finished school and was established, and it was with that understanding that when I had established myself he would turn it back to me, and also with the understanding that if I would marry that I would make my wife the beneficiary". Defendant's daughter corroborated this testimony as follows: "When my brother was going to school my father told him he

thought he better reassign the policy to him so that if he wanted to draw some money or something of that sort he would not be able. He wanted to protect him against himself and my brother assigned the policy. He felt trust in father." She said that this was discussed more than once, adding, "It was common knowledge in the family." From the testimony of defendant's wife, we quote: "Walter was in a fraternity house and he was afraid Walter might be like a lot of other boys and want a car, and want to borrow on the policy or something, and he thought it would be advisable to protect Walter's own interest until he got through school and would be married and settled down, that he would have him turn it over to him." The father gave the following account of his above-mentioned conversation with his son: "Well, this policy of which he was the beneficiary as long as he would be insured he would have the right to change the beneficiary. In a conversation one day he said, 'I can borrow some money on the policy, I want an automobile', and that immediately woke me up. As long as I paid all the premiums on this policy I got to thinking it over and I asked him to assign this policy back to me so that he could not borrow any money."

April 2, 1927, the son assigned the policy to defendant. The father did not explain upon what, if any, conditions a release of his interest was to be made, but the son swore that a return was to occur when he had completed his education, had become established in employment, and had married. While the son was still at college he married, but did not apprize his parents of that fact, and shortly following his graduation he obtained employment in San Francisco. He then informed his parents of his marriage. His marriage caused his father to manifest extreme displeasure. At once he in-

curred a dislike of the son's wife although he had not seen her. About two years after the marriage the son and his wife received an invitation to spend their summer vacation at the home of his parents, which they accepted. According to the testimony of all, the two weeks were spent in a very happy manner. Somehow the father had overcome his dislike of the son's wife and now showed great affection for her. More than once he stated that his son had a very good wife.

About two days before the son and his wife departed for San Francisco the policy of insurance was mentioned. According to the son's testimony, the father, referring to the policy, said: " 'Well, Walter, I have been thinking this matter over and I decided that it is the least I can do for you kids,' and he said, 'For your wife, I am sorry for what I said originally about her. I think she has made you an excellent wife, and that is the least I can do for you kids, and if you come down to my office tomorrow we will go down and have this policy—I will release this policy to you, and at least you will have that much protection for your wife as well as yourself in case of disability.' " The son testified that later in the evening when the family were at dinner the father made the same statement in the presence of all. We quote from his testimony: "He mentioned before all of us that he wanted to turn this policy back to me, that she had made a good wife to me, and he thought that it had been wonderful—he thought she had been wonderful to me, and that that was the least he could do for us." Plaintiff's wife, referring to this incident, testified: "We were all in the dining room the evening before, it was just a few days before we were going to leave for San Francisco, and Walter's father told him, 'Walter, if you will come down to my shop and meet me before lunch, I will turn

this insurance policy over to you.' " Defendant's daughter testified: "While my brother was still at home it was discussed and father wanted to return the policy back to my brother and he was married and getting along nicely, and he thought the time had come when the policy should be returned to him, and he said, 'We will go down and I will return this policy to you and you can make your wife the beneficiary.' " Defendant's wife testified thus: "Walter's little wife and we all went into the living room when they came up, and the question was discussed and after Mr. Grosz and I retired. Well, before that Mr. Grosz said to Walter, 'Come to the shop tomorrow and we will arrange to go up to Burnett Goodwin's office' and Walter said that he would go down to the office for lunch with him, and he then said, 'I will turn the policy over to you and make Marie the beneficiary.' And after Mr. Grosz and I retired that night he said, 'The kids are making about $150 a month, and they paid so much for their furniture, and they seem to be very happy and I will turn the policy over to Walter and he can give it to Marie, and if he is ill or there is a disability they will always have something to look forward to.' " The next day, August 22, 1929, at the appointed time the son came to the father's office. The father then searched through his files for the policy of insurance, finally declaring, "Oh, yes, it is with the insurance company, because there is a loan on it and they are keeping it while the loan is on the policy." They then called at the insurance company's office. It was the noon hour and only one individual, George B. Baker, assistant cashier, was present. According to the son, "My father told him (Baker) that he wanted to release this policy to me and told him that in view of the fact that he would like to get the papers and make out what was necessary, and Mr.

Baker made the papers out and I had to make my wife the beneficiary after the release of the policy.'' The plaintiff testified that the father signed the release instrument and he (the plaintiff) signed the instrument making provision for a change of beneficiary. Baker was not a notary public and, since he stated that the father's signature would have to be acknowledged before a notary, the father requested the plaintiff to accompany him to Mr. Burnett Goodwin's office, saying: ''Here, Walter, you take the papers and we will go over to Mr. Goodwin's office. His girl is a notary and she can witness my signature and that will release the policy to you and it will be completed.'' Goodwin was an insurance broker and a friend of defendant. According to the plaintiff, the two then went to Goodwin's office where Amelia Coleman, Goodwin's secretary, performed the necessary notarial service. After this had been done Goodwin entered. The plaintiff swore that, now being in possession of the completed documents, he handed them to Goodwin and asked him to deliver them to the Equitable Life Assurance Society so that whatever needed to be done by the insurance company could be done. We add that Goodwin was not an agent of the Equitable Company. The plaintiff testified that Goodwin accepted the papers for that purpose, and that, ''He was my agent.'' Thereupon the father and son departed. According to the testimony of the son, his mother, his wife and his sister, the father, in the evening following the execution of these documents, expressed keen gratification over the fact that the policy had now been returned to the son and that the latter's wife was the beneficiary. Miss Coleman testified: ''The only thing I remember about the incident is Mr. Grosz and his son came up there and asked that this release of assignment be notaried and I

notaried it." Next she identified the entries in Mr. Goodwin's office records, stating that a part was in his handwriting and the rest was typewritten by herself. She vouched for their accuracy. These records indicate that on August 22, 1929, the defendant released his interest in the $5,000 policy and at the same time plaintiff executed an application requesting the insurance company to name his wife the beneficiary.

Goodwin, who was a friend of the father, was unable to recall the visit of the father and son to his office upon the occasion just mentioned, but identified the entries in his office book and testified that at the time they were made he knew that the truth was being recorded. He expressed their effect thus: "John Grosz released, and that the beneficiary is changed * * * The beneficiary was changed that day to Marie Grosz, Walter Grosz's wife."

The father denied that he had released his interest in this policy. We quote from his testimony: "No, I have no recollection of doing anything about the $5,000 policy." When asked to be more specific, he replied: "I said I did not." When his attorney inquired whether that was his answer "notwithstanding the record of Mr. Goodwin", he replied: "He could have made a mistake and put down the wrong policy. I didn't turn over the $5,000 policy." The entries in Mr. Goodwin's records referred to the policy by the insurance company's identifying numbers, and Miss Coleman, who was familiar with both policies, denied that there was any possibility that an error could have been made.

The alleged assignment, as already indicated, if made, was executed and delivered to Goodwin August 22, 1929. Two days later the son and his wife returned to San Francisco and on August 29 the son suffered a very severe hemorrhage of the lungs. It developed

that he was afflicted with tuberculosis. This illness rendered him very weak and confined him to his bed. His mother visited him, and, according to her testimony, her son at once inquired about the policy. She assured him that the father would not fail to pursue the proper course to effect the release of his interest and the change of beneficiary. About this time the son began to receive regular monthly payments of $50 under the disability provision of the policy. Apparently these payments were made to the father and he remitted them to the son, but the manner in which this was done is not clearly indicated by the evidence.

When the father heard of the son's condition he at once inquired of Mr. Goodwin whether he still retained possession of the instruments executed August 22, and, receiving an affirmative reply, ordered their immediate destruction. His direction was obeyed. The fact that these documents had been destroyed was not communicated to any one. March, 1930, the son was returned to Portland and entered a tubercular sanitarium. Defendant continued to remit $50 payments monthly to the plaintiff until October, 1933. Thereafter he collected them from the insurance company, but used them for his own purposes. In October, 1933, a divorce suit was pending between the defendant and his wife. According to the testimony of the son and daughter, the father, in that month, insisted that they support him in the divorce suit with untruthful testimony. When both declined to do so the father, according to the son, ''simply went into a tantrum and said, 'You maybe don't know it, but if you don't speak up for me you will never get that policy.' He said, 'The assignment never went through.' He said, 'I went and got that back from Mr. Goodwin.' '' Defendant's daughter gave similar testimony. None of it is contradicted.

According to the record, this is the first information that the son received that the papers had been destroyed.

The father discharged all payments of premium upon the policy. The annual dividends were used for that purpose, and at times he borrowed money upon the policy to help maintain premium payments. The father possessed the policy at all times except when he borrowed money upon it. At those times the policy was in possession of the insurance company, including August, 1929, when the alleged release of interest was executed.

We think that the above constitutes a fair review of the evidence. Provisions of the policy necessary to a determination of the assignments of error will be quoted later.

■■ We believe that the above review of the facts indicates that the father's purpose in obtaining this policy of insurance was to assist his son. He was thinking of the latter's welfare and not of his own financial gain when he secured the policy. It is true that the father had his name inserted in the policy as the beneficiary and that he took possession of the document, but the policy provided that the disability allowances were payable to the insured (son), that loans would be made, not to the beneficiary but to the insured, that the surrender value of the policy belonged to the insured, that the latter could assign the policy, and that the privilege of changing the beneficiary would be exercised only by the insured. Every cent which the insurance company contracted to pay during the boy's lifetime was payable to the boy. Every cent which could be realized upon the policy during the boy's life through its assignment, its surrender, etc., was available only to him. Although the father would become the payment-beneficiary upon

the son's death, unless the boy nominated some one else in his stead, the provisions for disability payments, loans, surrender value, etc., constituted the boy, in the meantime, the payment-beneficiary of the contract: *Mutual Benefit Life Ins. Co. v. Cummings*, 66 Or. 272 (126 P. 982, 133 P. 1169, 47 L. R. A. (N. S.) 252, Ann. Cas. 1915B, 535); Williston on Contracts, § 369. In fact, the policy of insurance was really a chose in action: Cooley's Briefs on Insurance (2d Ed.), p. 118; 32 C. J., Insurance, p. 1093, § 178. Here were rights, therefore, which the son could enforce in his own name and for his own benefit. They, therefore, belonged to him. The fact that the boy was then scarcely 18 years of age possibly accounts for the fact that the father took possession of the policy. But possession of that instrument, since it was not negotiable, was a matter of little consequence. See *Wood v. Phoenix Mutual Life Ins. Co.*, 22 La. Ann. 617. If any consideration between father and son was necessary to support this transaction, it was present in the love and affection which each bore to the other. But, in truth, the father procured these valuable rights for his son as a gift.

■ The defendant's solicitude for his son caused him, not only to send the boy to college and to obtain for him these valuable contractual rights but also to look forward to the period beyond graduation when the son would have a wife. He wanted the latter to have the protection of life insurance. The insertion of the defendant's name in the policy as beneficiary is immediately followed with the words: "with the right to the insured to change the beneficiary or to assign this policy". The provision of the policy entitled "Beneficiary" reads: "If there is no written assignment of this policy in force and on file with the Society; (a) The Insured may from time to time during its contin-

uance change the beneficiary or beneficiaries by a written request, upon the Society's blank, filed at its Home Office, but such change shall take effect only upon the endorsement of the same hereon by the Society. * * *'' Such being the limitation upon the defendant's rights as beneficiary, he had no vested interest in the policy (Cooley's Briefs on Insurance (2d Ed.) p. 6406; Couch on Insurance, p. 825, § 308) unless the son's subsequent assignment to him increased his rights. It is evident that defendant inserted his name as beneficiary only temporarily—until the plaintiff had won a wife.

Our belief that the father at the very outset thought that the policy belonged to the plaintiff is strengthened, if not demanded, by the following uncontradicted averment of the complaint: ''In consideration of love and affection said defendant Grosz procured the issuance of said policy to plaintiff.'' Possibly defendant's admission of the truth of this averment is not a complete concession that the plaintiff became the owner of the policy and of all the rights it conferred, but it approximates such an admission.

■ We come now to the action which was taken by the son August 2, 1927, when he executed the instrument of assignment to his father. It is evident that at that time the father must have thought that the plaintiff was the owner of the policy. The defendant does not contend that at that time he had any lien upon or interest in the policy which he sought to protect by obtaining an assignment, but agrees with the boy that he induced him to make the assignment so as to protect the boy against a possible unwise disposition of the policy, thereby impliedly conceding that the plaintiff owned the policy. It is clear that this assignment was not intended to invest the defendant with the beneficial

interest of the policy so that he could, for instance, collect for his own enrichment the disability benefits if the boy became disabled, but that its purposes were for the benefit of the boy. Such being true, the defendant took title as trustee for the plaintiff, assuming, in so doing, a duty to transfer title back to the son when the latter had graduated, married and become established in business. The policy, with all the rights which it confers as a chose in action, was the subject matter of the trust.

■ August 21 and 22, 1929, circumstances developed which we think fortify the belief just expressed. August 21 the defendant announced to his family his gratification with his son's development and his pleasure with the latter's choice of a wife, following this with an announcement that he was now going to release his interest in the policy and have his son make his wife the beneficiary. The defendant does not deny that this took place; he merely denies that he executed the release. But the evidence which indicates that he signed the release, acknowledged his signature before a notary public, handed the release to his son, and that the son intrusted the papers to Mr. Goodwin for delivery to the life insurance company, can not be disbelieved. The fact that the father attempted to contradict evidence of such a high degree of cogency is a circumstance discrediting to his entire cause. We conclude that the father at all times regarded the plaintiff as the owner of this policy and that on August 22, 1929, he signed an instrument releasing his interest, acknowledged his signature before a notary public, handed the instrument to his son and that the latter handed it to Mr. Goodwin as his agent to deliver to the insurance company. We also conclude that at the same time the son signed an application for change of beneficiary in be-

half of his wife which was also delivered to Mr. Goodwin for transmittal to the insurance company. At that time the policy was in the possession of the insurance company.

■ The defendant contends that he never made his son a gift of the policy because the son never had possession of it. But, as we have already seen, the contractual rights which the policy created (except upon the death of the son) belonged to him, and until he assigned the policy to the defendant (as trustee) he was the only one who could enforce those rights. Every right which the contract of insurance created belonged to the plaintiff and could be enforced by him for his sole benefit, except, of course, the right to collect upon his death. These rights were not dependent upon possession of the policy. Therefore, the possession of the document was a matter of little consequence: *Wood v. Phoenix Mutual Life Ins. Co.*, supra.

■ But if we assume that somehow the defendant had an interest in the policy, the fact that he did not hand the document to the plaintiff on August 22, 1929, when he handed to the plaintiff the instrument releasing his interest, did not deny to the transaction capacity to transfer title. It will be recalled at that time the policy was in the possession of the life insurance company and that upon that day the defendant did everything that he could do to transfer title. At the close of the day he believed that he had completed a transfer, as is evident from the declarations of satisfaction which he made to the family at the dinner table. Under such circumstances the transfer took effect and the plaintiff became the owner of the policy: 28 C. J., Gifts, p. 636, § 25; see especially *Thompson Extrx. v. Thompson,* 190 Ky. 3 (226 S. W. 350); *Hurlbut v. Hurlbut,* 49 Hun., (N. Y.) 189 (1 N. Y. S. 854); and *Northwestern Mutual Life*

*Ins. Co. v. Wright,* 153 Wis. 252 (140 N. W. 1078, Ann. Cas. 1914D, 697).

■ But the defendant argues that the instrument which he signed August 22, 1929, was ineffective to transfer title to the plaintiff because it never reached the files of the home office of the insurance company. The policy provides: "No assignment of this policy shall be binding upon the Society unless in writing and until filed at its Home Office. The Society assumes no responsibility for the validity of any assignment." That provision was for the protection of the insurer and does not enable the defendant to invoke it for the avoidance of his assignment: *Thompson Extrx. v. Thompson,* supra; *Opitz v. Karel,* 118 Wis. 527 (95 N. W. 948, 99 Am. St. Rep. 1004, 62 L. R. A. 982); *Spencer v. Myers,* 150 N. Y. 269 (44 N. E. 942, 55 Am. St. Rep. 675, 34 L. R. A. 175); Cooley's Briefs on Insurance (2d Ed.) p. 1827. See also *Northern Life Ins. Co. v. Burkholder,* 134 Or. 401 (293 P. 919, 131 Or. 537, 283 P. 739). From 37 C. J., Life Insurance, p. 430, § 140, we quote:

"As between the assignor or those claiming under him and assignee notice to and consent of, the company is not necessary, even though required by the terms of the policy."

The mere fact that defendant's release was wrongfully destroyed by plaintiff's agent and was not delivered to the defendant insurance company can avail the father nothing. The insurance company has not appealed and must, therefore, be deemed satisfied with the decree.

The policy of insurance, as already stated, was a chose in action. As such, it was capable of assignment in the same manner as any other chose in action, except that the insurer could refuse to honor an assignment

made in contravention to the terms of the policy: Cooley's Briefs on Insurance (2d Ed.) p. 1787; Williston on Contracts, § 430, and 37 C. J., Life Insurance, p. 422, § 123. The instrument which the father signed, as described by the witnesses, was a release of his interest and a cancellation of the son's assignment to him. We believe that it was sufficient to terminate the trust and reinvest the plaintiff with title to the policy: Williston on Contracts, § 430; *First National Bank v. Liberty Trust Co.*, 151 Md. 241 (134 Atl. 210, 47 A. L. R. 730).

It follows that defendant has no interest in the policy, and that the plaintiff is the insured with all of the rights attendant upon his status as such.

The decree of the circuit court is affirmed. Costs and disbursements will be allowed to neither party.

CAMPBELL, C. J., and KELLY, BELT, BEAN, BAILEY and RAND, JJ., concur.