## NOVOSEL ET AL. v. SUN LIFE ASSURANCE COMPANY OF CANADA ET AL.

(No. 1926; March 3, 1936; 55 Pac. (2d) 302)

(Rehearing denied May 5, 1936)

See 57

Pac. (2d) 110.

For the appellant there was a brief and the cause

was argued orally by *Edwin V. Magagna* of Rock Springs, Wyoming.

For the respondents, there was a brief and oral argument by *T. S. Taliaferro, Jr.* of Rock Springs.

BLUME, Justice.

On September 9, 1929, Ludvig Novosel, Jr., deceased, then sixteen years of age, applied to the Sun Life Assurance Company, herein called the insurance company, for a policy of insurance on his life, in the sum of $3,000, making Ludvig Novosel and Annie Novosel, his parents, the beneficiaries of the policy. On October 30, 1929, a policy, as applied for, was issued by the insurance company, numbered 1,154,308. The premiums were due on November 3rd of each year. In the application, the insured reserved the right to change the beneficiaries, and the policy contains the following clause 12:

"This policy is issued with the express understanding that, provided he has not assigned it or any interest therein, the assured may, without the consent of the beneficiary, (a) change the beneficiary or beneficiaries from time to time during the continuance of this policy by filing with the Company a written request in such form as the Company may require, accompanied by this policy, such change to take effect only upon the endorsement of the same on the policy by the Company; (b) Surrender, assign or pledge the policy and receive, exercise and enjoy every benefit, right and privilege conferred upon the assured by the terms of this policy."

Somewhat later in November another policy, an exact duplicate of the first, but numbered 1,174,381, with

premiums due on November 20 of each year, was issued to the deceased by the same insurance company. On January 15, 1934, apparently with the consent of the parents, the insured was married to Mary Kantor. On March 30 of that year, he made out the proper papers for a change of beneficiaries on the policy first above mentioned, designating his wife as such beneficiary, and sent them, together with the policy, to the insurance company, which received them prior to the death of the insured. An application for a loan, the amount of which does not appear, was also made. The insurance company failed, neglected, or refused to make the loan or to enter upon its record the change of beneficiary, seemingly on account of the fact that at that time the insured was not quite of age. In April, 1934, the insured went to Rochester, Minnesota, to be examined by Mayo Brothers. He died April 21, 1934, then 20 years, 11 months and 10 days of age. After his death, the parents of the insured, plaintiffs herein, were paid the sum of $3,000 on the second policy herein mentioned, that policy being in their possession. The first of the above mentioned policies was then in the possession of the insurance company. Plaintiffs also claimed the proceeds of that, and brought this action against the insurance company to recover it. The insured's wife also claimed such proceeds. The insurance company interpleaded, alleged that Mary Kantor Novosel also made claim to the proceeds, deposited the money, and were by the court discharged from all further obligations. Mary Kantor Novosel, hereinafter sometimes referred to as the intervener, through her duly appointed guardian, was thereupon brought into court, and she, through her guardian, made claim to the proceeds of the policy, relying on the fact that she was the last designated beneficiary of the policy as hereinbefore mentioned. The court awarded the proceeds of the policy to the plaintiffs, and from a judg-

ment to that effect, the guardian, on behalf of his ward, has appealed.

1. Counsel for plaintiffs, respondents here, claim, among other things, that the policy of insurance in question was the property of the plaintiffs from the beginning, inasmuch as the father took it out on the life of the insured for the benefit of himself and his wife, and that he, the father, paid all the premiums thereon. It is, of course, true that a parent may take out a policy of life insurance on the life of his minor son, and if he pays the premiums thereon he has been held to be entitled to the proceeds thereof. John Hancock Mutual Life Ins. Co. v. Lawder, 22 R. I. 416, 48 Atl. 383; 37 C. J. 403. A good illustration of a policy of that character is described in the case of Sheets v. Sheets, (Colo. App.) 36 Pac. 310. But the physical facts in this case show that the contention of counsel is erroneous. The record discloses that the application for the policy was made by the insured. He signed it; filled in all the blanks in his own hand-writing and answered all the questions; he stated therein that he, the insured, would pay all the premiums; that he would not assign the policy; that he reserved the right to change the beneficiary. The policy was issued accordingly and contained the right of such change, itself showing that all the rights the parents had therein was a right of expectancy and nothing more. 37 C. J. 579. We are unable to see how, in face of these physical facts, original ownership of the policy can be claimed by the plaintiffs, although it is not at all improbable that the father was one of the inducing causes of the policy being taken out. Furthermore, as will be shown hereafter, the insured claimed ownership of the policy in the fall of 1933 and on March 30, 1934. And in the fall of 1933, as will be shown hereafter, the father permitted the son to give himself out as the owner. There was some testimony that the insured said prior to his death—

the time not being shown—that the father, or the parents, were the owners of the policy, but these statements, as shown hereafter, had reference only at most to the ownership then existing. Two of the sons of plaintiff testified that when the agents—the witness Whitcomb being one of them—brought the policy to the home of plaintiffs, he stated "Here is the policy you took out on your boy." Apparently both policies were so delivered, and the testimony fails to indicate to which policy reference was made. Moreover, the statement would be hearsay, except for the presence of the insured, who lived with his parents, and nothing more could be claimed for the statement than, that the insured should have contradicted it, if the policy was his. But that would be too much to expect from a boy sixteen years of age, at the home of his parents, under the control of his father. Nor can it be surprising that, as some of the testimony shows, the father paid the first premiums. We do not doubt that a multitude of fathers do the same thing, and not for their own advantage, but to help the child along in the world. The theory that the parents were the original owners of the policy must be discarded. That conclusion will appear even more clearly as we proceed. We need not decide whether, under the physical facts here disclosed, a resulting trust could ever be shown by parol evidence in a case like this. If it can be, it has not been shown in the case at bar. No substantial evidence supports such claim. The relationship of the parties prevents it. The presumption would be that the policy was a gift, and no trust would result in favor of the party paying the first premium, or any other. 65 C. J. 403. And the acceptance of the policy with the clause of the right of change of beneficiary would seem to be an insuperable obstacle to the claim on the part of the parents that the policy is not the policy of the son.

2. Counsel for plaintiffs contend that the conditions

of the right to change the beneficiary were not complied with, in that no endorsement of the change was made by the insurance company, and that the change accordingly is void. A great part of the brief is devoted to this point. But it is not necessary to review the cases cited. This court has already settled the point in this jurisdiction. It was held in Brotherhood of L. F. & E. v. Ginther, 35 Wyo. 244, 248 Pac. 852, 252 Pac. 1026, that when an insured has done all that he could do in changing a beneficiary, the failure of the insurance company to perform a ministerial act will be immaterial. There was a dissenting opinion in the case, but the principle just mentioned was not questioned therein. See also 14 R. C. L. 1392, Sec. 556, and Wentworth v. Equitable Life Assurance Society, 65 Utah 581, 238 Pac. 648. The insured filled out the proper blanks required by the company, and these, together with the policy, were sent to the insurance company. The endorsement of the change was but a ministerial act, and the failure of the insurance company to make it is immaterial. The rule is based on equity. Counsel say that this is purely an action at law, and no equitable principle has been invoked. They are in error in both contentions. The facts which required the application of the rule were stated in the intervener's petition. Nor is this purely an action at law, as we have pointed out many times. The distinction between actions at law and suits of equity were abolished, and we have only a civil action. Sec 89-301, Rev. St. 1931. Legal as well as equitable principles alike are administered in this action, depending upon the facts. When the facts present a case requiring the application of principles heretofore known as equitable, it is the duty of the court to apply them. If principles of law and equity both appear in the case, the latter must be given preference, unless, perhaps, a positive statute forbids. We have, for instance, a statute of frauds. If facts

appear which take the case out of the statute, according to principles of equity, the latter must prevail. And the instant case illustrates the subject well. Legally, the requirements of the conditions of change of beneficiary have not fully been complied with, but the facts disclose, both in the pleadings as well as in the evidence, that the change has been effected according to principles of equity, and these accordingly must prevail. See Upjohn v. Moore, 45 Wyo. 96, 16 P. (2d) 40; Bamforth v. Ihmsen, 28 Wyo. 282, 300, 204 Pac. 345; Sugar Co. v. Fritzler, 42 Wyo. 446. 473, 474, 296 Pac. 206; Brewer v. Folsom Bros., 43 Wyo. 433, 5 P. (2d) 283. Curiously enough, counsel for plaintiffs themselves at times invoke equity, and, in fact, their cause, if well grounded, must depend wholly thereon. The intervener in this case, accordingly, made out a prima facie case, and the burden of proof to establish any right to the proceeds of the insurance policy in question was on the plaintiffs. The degree of proof will be referred to later.

3. The plaintiffs further claim the right to the proceeds of the insurance policy in question because, as they say, they have shown an oral assignment of the policy to the father of the insured, and that a change of beneficiary could be made only upon the condition or proviso stated in clause 12, that "he has not assigned it or any interest therein." The premise that an assignment has been shown is incorrect, as will be seen hereafter. But even if that were not so, still plaintiff's objections to the change are not well taken. The proviso in clause 12 above mentioned should, we think, be construed in connection with clause 13 of the policy which provides that "no assignment of this policy shall be binding upon the company unless in writing and until filed at its head office." The proviso in clause 12 was designed, we think, for the benefit of the company, so as not to have two or more claimants of the pro-

ceeds at the same time while the policy is current, and contemplates an assignment in writing. If this were not true, the insurance company would be required in every case, though no written assignment appeared, to investigate every time a change of beneficiary were desired, whether or not there existed an oral assignment, which would be most difficult, would often take a long time, and at times would be impossible of definite ascertainment. It is improbable, and almost impossible to believe, that the company would assume such a burden. If, however, by chance, this deduction is incorrect, it must at least be true that the proviso in clause 12 can refer to nothing more than an assignment recognized by law, and existing at the time when a change of beneficiary is desired to be made. And an assignment legally revoked cannot be considered as an assignment recognized by law. That the insured revoked whatever assignment is claimed to have been made, is clear from the fact that without any reservations whatever, he designated his wife as the person who should have the proceeds of the policy in question here; that he attempted to get a loan thereon; and that he left one of the policies on his life unchanged in the hands of the parents. Was he entitled to do so? It must not be overlooked that minors have been from early dawn of civilization, and are now, favorites of the law. They have the capacity to take, but their capacity to give is limited. They have capacity to contract, at least when of sufficient age to understand what they are doing, but, in general, they have the right to repudiate their contracts. Thus they may contract to insure their lives, but the contract is, ordinarily, voidable at their election. 31 C. J. 1086. So their assignments of a contract are void, or at least voidable, and may be repudiated unless some equitable circumstances appear which should impress a trust upon the contract, as, for instance, where a bank or other third

party pays premiums, in order to preserve their security for money advanced or loaned on the strength of the assignment. 31 C. J. 1087; City Sav. Bank v. Whittle, 63 N. H. 587, 3 Atl. 645; Levin v. Ritz, 17 Misc. 737, 41 N. Y. Supp. 405; Scobey v. Waters, 10 Lea (Tenn.) 551. It is, accordingly, incumbent on the plaintiffs herein to prove some special reasons why the change of beneficiary shown herein should not be upheld. Counsel for plaintiffs claim, as one of the reasons, the fact that the father paid all of the premiums on the policy. John Novosel and Mike Novosel, brothers of the deceased, testified that their father paid the premiums. Asked how they knew, they stated that they were present when the policy was delivered and that the father paid the first premium. John added that he "was with him (his father) when he paid the last." This at most shows that the father paid the first and the last premiums. Nothing more. Wayne Symes, a witness for the plaintiffs, and disinterested, stated that he had heard the insured stating a good many times that "he owed quite a few bills, and that his father had to pay *his* life insurance for him." The talk that he remembered was that in the fall of 1933, and the many talks may, of course, have related to the payment of a single premium—the last. The witness Whitcomb, one of the agents, who wrote the policy in question, testified that the insured personally paid the premiums to him at several times. He further testified, fortified by a copy of a letter, that on November 20, 1933, the insured came to him, seemingly, according to the letter, to surrender one of the policies, so as to apply the proceeds thereof on the other, and not to make the burden of carrying both policies too great. He persuaded the young man to get an extension of time for payment. $40, however, was paid by the insured. The balance remaining due was paid in several installments, part of which was paid by the assured

and part by his father. The witness was disinterested, and nothing appears why the court should not credit his testimony. It was attempted to be shown that the work which the young man had was limited in amount, since the mines, where he worked, were running only part time. But the evidence is too indefinite upon which to form any opinion. The most which the court could have found under the testimony was, that the father paid the first and part of the last premium; that the insured paid several of them, and since only few premiums in all were paid, he seemingly paid most of them.

However that may be, whatever payments of the premiums may have been made by the father, they were voluntary. At least nothing to the contrary is shown. The father's relation to the son puts the situation in a light different from that where a stranger pays the premiums. And the rule appears to be that the mere voluntary payment of premiums will not deprive the insured of the right to change beneficiaries in accordance with the reservation thereof in the policy, unless there is an agreement to the contrary. Wentworth v. Equitable Life Ins. Soc., 65 Utah 581, 238 Pac. 648 and cases cited; Supreme Council etc. v. Behrend, 247 U. S. 394, 38 Sup. Ct. 522, 62 L. Ed. 1182 and numerous cases cited; 18 A. L. R. 392. In the case decided by the Supreme Court of the United States, the insurance policy (fraternal) was taken out by the husband. He reserved the right to change the beneficiary. His wife was first designated as such. Later another was substituted. The court said:

"The mere fact that she (the wife) paid some, and possibly all, of the assessments, prior to the change of beneficiary, even if paid out of her separate estate, raises no legal claim. Perhaps there was not even a moral claim; since throughout the period during which she paid assessments, she enjoyed the full protection

which the order agreed to furnish, and for this alone payments were made."

The same rule was applied in Fisk v. Equitable Aid Union (Pa.), 11 Atl. 84, where the first beneficiary paid all the premiums. We can the more readily accept the rule here stated as applicable to the case at bar, in view of the fact that "the legal inference arising from advances of money by a parent to, or for the benefit of his child, when unexplained, is that they were by way of gift or advancement and not by way of loan." 46 C. J. 1322. In fact counsel of the plaintiffs, in commenting on the case of Wentworth v. Equitable Life Assurance Co., supra, admit that the rule, as discussed therein, "is concurred in by all law writers and courts, and is a clear exposition of the law." And we must not forget, in this connection, that, just as in the case of Supreme Council etc. v. Behrend, whatever premiums the parents paid, they paid for their own benefit, since they were then the beneficiaries of the policies, so that we may well say with the Supreme Court of the United States, that "perhaps there was not even a moral claim" for the repayment thereof. Nevertheless, in order that it may not be said that we have overlooked any arguments of the plaintiffs, we shall proceed to discover whether or not any such agreement as above mentioned (the enforcement of which would seem to be based on equitable grounds) or any other equitable reasons exist in favor of the claim of plaintiffs. We do not decide at this time that the plaintiffs would have a right to recover herein, even if such agreement were shown; for, doubtless, it might be revoked the same as an assignment, unless prevented by some equitable rule.

4. The testimony to show such agreement and ownership of the policy by assignment is substantially as follows. John Novosel, a son of plaintiffs, testified as follows:

"Q. Did you ever hear your deceased brother say anything about this policy? A. Yes, sir, I did; he mentioned it many times that that belonged to his dad. Q. What do you mean by many times? A. He said more than once. Q. How did he happen to say it? A. Well, he owed his dad quite a lot of money, and he used to say that belonged to him."

The witness Mike Novosel, another son of plaintiffs, testified:

"Q. What did he (the insured) say? A. He said 'I am glad my dad has got that insurance policy. I owe him and the only way I can pay,' he said that not only once but several times. Q. What did he mean by debts? A. He would stand behind him, when he bought a car, and Dad would give him money when he was running around. Q. Who did your deceased brother say owned the policy? A. My Dad. Q. Whom did your deceased brother say owned the policy? A. Why Dad and Mother."

A daughter of the plaintiffs testified:

"Q. What did he (the insured) tell you? A. He always told me everything. He told me 'I am so glad my father has those policies. * * * I know what I have done to my father, and now if ever anything happens, my father will be taken care of. * * * Dad is protected and I don't care about anybody else,' that is what he always told me. * * * He had the blues, he had debts, and he was a great spender; he couldn't make enough money to get the money he spent."

It may be noted that the sons said nothing about the second policy of $3000 above mentioned, and without an explanation in that regard, there is no way to tell whether the insured talked about the first or the second policy. Disregarding that point, however, it is very clear that all the talks turned round the debts of the insured, and that the sum and substance of the testimony is at most to the effect that he, the insured, was glad that his father had the policy so as to protect the latter against loss for any money received by the son from the father. It was the debts which troubled the

insured, as is also shown by the testimony of the witness Symes. And all that he meant, evidently, was that he was glad that his father, as one of the beneficiaries of the policy, and in that sense the owner, would ultimately be repaid. There is not a word that the father had the policy under an *agreement* that the debts should be paid therefrom; he simply at the time when he made the declarations was glad that they would be paid. He was correct at the time, since had he not made a change of beneficiary in one of the policies, the parents would have had the proceeds of both. But the fact did not take from him the right to change the beneficiary, unless other facts were shown; and these other facts are lacking. Of course, counsel for plaintiffs try to make something more than we have indicated out of the statements of two of the sons to the effect that "dad owned the policy." We think, however, that the testimony as a whole cannot be construed otherwise than as we have. But even if "dad owned" the policy by assignment, such ownership, as we have already shown, could be and was revoked, and counsel would still be compelled to show equitable facts to establish their case. In other words, the right of recovery herein on the part of the plaintiffs depends, in its final analysis, upon the fact as to whether or not they have shown such equitable facts which call upon the conscience of the court to give them relief. We may say further that the daughter did not testify to such "ownership," and the testimony of the disinterested witnesses shows the contrary. Wayne Symes testified to the payment of the premiums of *his*, the insured's, policy. The testimony of the witness Whitcomb, also disinterested, shows that the insured on November 20, 1933, treated the policies as his own. And it is at least queer, if the father owned the policy in question, that he did not himself arrange for the premiums due in November, 1933, but let the insured

do so, and thus permit him, or give him an opportunity, to hold himself out to the world as the owner of his policies.

5. It is also contended that the intervener cannot recover herein because "the policy was delivered by the insurance company to the father, and was surreptitiously, and without the father's knowledge or consent, extracted from the father's desk." It is true that there is testimony that the policy was handed over to the father by the agents, but, under the circumstances at least, there is no evidence of ownership on the part of the father. The whole family was gathered at the place, and it was but natural that the agents should give the policy to the head of the house. Further, the parents of minor children are their natural guardians. Bowers v. Parker, 58 N. H. 565; Burke v. Prudential Ins. Co., 221 Mass. 253, 108 N. E. 1069, Ann. Cas. 1917 E. 641. They were the natural custodians of the policy. But the contract was made by the insured. It was his property. Except for his minority the right of possession was in him. Cooley, Briefs on the Law of Insurance, Vol. 1, page 116. Hence, unless facts to the contrary are shown, which has not been done, the right of possession of the parents was but as custodians, and possession under these circumstances was no evidence of title. It was held in Jory v. Supreme Council, 105 Cal. 20, 38 Pac. 524, that when an insured, who has the right of changing the beneficiary, cannot obtain possession of the policy, by reason of the first beneficiary to deliver it up, he can nevertheless make a valid change by complying with other necessary requirements. If, accordingly, in this case the parents had refused to deliver the policy for the purpose of making a change of beneficiaries, a change would have been effected, under the rule heretofore mentioned, though the policy had not been sent in. And we doubt not that, in case of such refusal, the insured, by a guardian ap-

pointed by the court, could, in the absence of equitable reasons to the contrary, have compelled the delivery of the policy for the purpose of making such change.

Nor is there any evidence in this case to sustain the contention that the policy was surreptitiously removed from the father's desk. It seems that it and other papers were kept therein, and that it was accessible to all the members of the family. The father's home was the insured's home up to a time shortly before his death. One of the sons of plaintiffs testified that he saw the policy last in March, 1934. It seems that it was in an envelope. He evidently had access to it, just as the insured had, and one wonders what business he had in looking into the envelope. In any event, simply because the policy in question was still in such envelope in early March, 1934, proves nothing as to what took place thereafter until March 30th, 1934, when the papers in regard to a change of beneficiaries were sent to the insurance company. At that time the insured was married; he perhaps also realized that he was sick and was uncertain as to the future, and he became possessed of the laudable desire to protect his wife, and possible offspring. At the same time, he considered his father; probably on account of debts. What the indebtedness was is not shown; the testimony indicates but small sums, one of $60 and one of $80, and some premiums paid. Counsel for plaintiffs evidently think that the indebtedness arising out of the last illness of insured should be considered. But in all probability neither the son nor his father considered them; at least there is no evidence indicating the contrary. Thousands, doubtless, of parents every year pay these expenses for their minor children without any thought of having them repaid. However that may be, judging from common experience the sum due the father, including the expenses of insured's last illness and death, in all human probality amounted to much less than

$3000, and this amount has been paid by one of the policies, so that we cannot see how the parents are, in equity, entitled to any more than that amount. It has not been shown that they are. So it would seem that the boy, instead of being a purloiner of goods, acted, by leaving one of the policies unchanged, as a loyal and honorable son of the most worthy parents. Moreover, the son was married with the consent of his parents. Whether the consent was valid in law or not is immaterial herein. We mention that fact merely as showing that father and son remained friendly. The situation was then wholly changed. The father of insured is shown to have been a benevolent parent. And it is almost inconceivable that an ordinary parent, let alone one of benevolent disposition, could, upon his son's marriage, desire, with a clear conscience, to strip him of all worldly goods, leaving, in case of the latter's death, his wife and possible or probable offspring in a helpless condition. Hence we cannot agree with the contention of counsel for plaintiffs that we should besmirch the name of the dead, and consider the boy as a liar and a thief. The only way in which we can explain the instant suit is by reason of the fact that the son's death, after his marriage, was so sudden.

6. Summarizing the situation in this case, then, we find that the plaintiffs cannot be held to have been the original owners of the policy in question, since the contract was between the insurer and insured. Plaintiffs were the originally designated benefiiciaries thereof, but inasmuch as the right to change was reserved to the insured, they had only a right of expectancy. 37 C. J. 579. This right was nullified when the insured designated Mary Kantor Novosel as the beneficiary. If the parents obtained any greater interest in the policy than already mentioned, it must have been after its issue. No such interest has been shown to have been granted by the insured, either in writing or orally. But

if by any possibility it could be said that there is some testimony tending to show an oral assignment of the policy was made to the father of the insured, such assignment was revoked, and the insured, as a minor, had the right to revoke it, unless for some equitable reasons the policy should be charged with a trust for money expended on the minor's behalf by the father. Such expenditures must, in the absence of evidence to the contrary, be taken as a gift. And there is no evidence to the contrary, except a showing of a consciousness on the part of the insured that he should repay his father for any outlay on his behalf. The amount of such outlay, so far as the evidence indicates, was comparatively small. The father, perhaps, paid part of the premiums. But even the total premiums paid on both policies herein mentioned would be only the sum of $790.00. The expenditures arising out of the boy's last sickness and funeral cannot be taken into consideration. Under the law, the father was compelled to pay them (46 C. J. 1262, 1278) unless, perchance, the child was emancipated, which, as counsel for plaintiffs concede and in fact contend, is not true in this case. At least no more than a moral or equitable obligation on the part of the insured can be claimed. And that moral or equitable obligation, if it existed, was discharged. The parents received the sum of $3000 on the second policy herein mentioned. A contention that this policy has nothing to do with the case is unsound. It has much to do with it, under the facts in this case. The insured had the right to change the original beneficiaries of that policy the same as those of the first. But, evidently out of affection for his parents, and to meet any possible obligations due them, he did not do so, thus not only discharging any moral obligation resting upon him, but eliminating any question of equitable considerations in favor of the parents as well. We see no possible reason why Mary Kantor Novosel should be deprived of the

benefit which she received by reason of the act of her husband, upon whom rested at least the highest moral obligation not to leave penniless his wife and possible offspring. The right thus bestowed should not be lightly taken away. Talks and statements at random are uncertain factors to do so. In Fee v. Wells, (Colo.) 176 Pac. 829, the court said:

"Proceeds of a life insurance policy are a property right, and before the beneficiary can be divested of the title, use, and enjoyment thereof by mere reported statements made out of court to strangers, upon the ground that they are statements against interest, the evidence will be received with great caution, and the proof must be beyond a reasonable doubt. The presumption arising from making Mrs. Fee beneficiary must prevail until the contrary is established beyond a reasonable doubt. Skeen et al. v. Marriott, 22 Utah 73, 61 Pac. 296; Ferguson v. Robinson, 258 Mo. 113-133, 167 S. W. 447."

The case, in its facts, is, of course, different from the case at bar, and yet the language is appropriate, though we need not go as far as the Colorado case.

The judgment of the trial court is reversed, with direction to enter judgment for the intervener, Mary Kantor Novosel, or her guardian. The sum of $150 was awarded to counsel for the insurance company, as interpleader. No one has questioned that order, and it is not involved herein.

*Reversed, with direction.*

KIMBALL, CH. J., and RINER, J., concur.

## ON PETITION FOR REHEARING

BLUME, Justice.

A petition for a rehearing has been filed herein. Counsel takes up, seriatim, numerous statements contained in our original opinion, and earnestly attempts to show that many of them, and most of our conclusions, are "illogical, illegal and unsound." Notwithstanding the eloquent arguments of counsel, we are unable to see how, under the substantially undisputed

testimony on the vital points herein, plaintiffs can recover. We went into the various points of the case in detail, and meant to cover every phase of it, stating our conclusions on various alternative situations conceivable in the case, and find that counsel by reason thereof think that we hesitated and expressed doubt on this point and that. We think, however, that we stated our conclusions with reasonable certainty, and that they are correct. There are a few points, however, which, by reason of the fact that they were not mentioned in the original opinion, or by reason of their importance, deserve comment or further comment.

1. Counsel takes exception to what we said on the point of revocation of any oral assignment which the insured might have made. What we meant by that is clearly shown in the original opinion, and we need not go over that again. It is argued, however, that, in order that a minor may revoke an assignment made by him, it is necessary for him to have a guardian, go into court, give due notice to the opposite party and have the revocation duly adjudged in court. We think that this was unnecessary in this case. The change of beneficiary made by him itself, we think, revoked whatever, if anything, he had done which was inconsistent therewith. 31 C. J. 1068-1069.

2. Counsel refers at various places in his brief on rehearing to the fact that the insured was mentally incompetent when he made the change of beneficiary. We did not refer to this point in the original opinion, since counsel for plaintiffs in his original brief mentioned it but incidentally, and counsel for intervener did not mention it at all, and we did not think that there was any evidence to support the contention. The fact that the boy took a policy of $3000 and made his wife the beneficiary thereof seems like a perfectly natural act of a sane man, and the further fact that he left his

parents as the beneficiary of another policy of $3000 would seem to indicate a keen and just sense of discrimination. Mrs. Mackie's testimony merely showed that the insured had the blues at times, which few, if any, of us escape. Dr. Newman testified that he examined the insured from time to time commencing with January, 1934, to March 3rd, 1934; that the boy complained of vertigo; that Mayo's later found an encephalitic condition of the brain—"a slow inflammatory process that goes on in the brain."

"Q. What would you say on the third of March, 1934, as to Ludwig Novosel Jr. being able to transact his business or transact business intelligently? A. I didn't go into the functioning of that gland especially. A man in that condition is not a normal man, and he undoubtedly had that condition before he reported to me, it is not a condition that comes on suddenly. Q. Do you know whether he went alone? (to Mayo's at Rochester, Minnesota). A. I don't recall. Q. Was he capable of taking care of himself, if he did? A. I would say he could do that, yes." .

This evidence fails to show that the insured was insane at the time when he made the change of beneficiary. No man who is sick is "normal," but that does not constitute proof of insanity.

3. So many policies are taken out by parents on the lives of their minor children that it has seemed advisable to again give a thorough consideration to the subject of original ownership of the policy in question, and to clarify and amend what we said on that subject in the original opinion and consider the point in its fundamental aspects. After an exhaustive search of the authorities, both now and at the time of the original hearing, we have found none directly in point. The late case of Grosz v. Grosz, (Ore.) 50 P. (2d) 119, deals with a policy like that in the case at bar. The father obtained a policy on the life of his son, whether in conjunction with the latter does not appear. The

original ownership was by the parties assumed to have been in the father. The court seems to have taken a different view, though the point was not directly involved. And it may be of interest to quote what was said in the case of Mut. Benefit Life Ins. Co. v. Clark, 81 Cal. App. 546, 254 Pac. 306, as follows:

"Where the policy of insurance names a third person as beneficiary, the policy is then a contract made for the benefit of a third person, and the third person is called the beneficiary. The beneficiary is not a party to the contract, and is not the owner thereof, and where a policy of insurance reserves to the insured the right to change the beneficiary, the interest of the designated beneficiary, prior to the death of the insured, is that of a mere expectancy of an incompleted gift, subject to revocation at the will of the insured."

If parents desire to take out a policy for their own benefit, that is easily done. All that is necessary is to leave out of the policy the right to change the beneficiary. In such case, it is universally held that the rights of the originally designated beneficiary become vested. 37 C. J. 578. When it is so easy to fix such vested interest, a course taken to the contrary to that above mentioned ought not lightly to be construed as though in conformity therewith and thus give rise to all kinds of litigation, as it did in this case. If a person is insured, with right in the policy such as granted in that in the case at bar, such insured, ordinarily at least, would be considered the owner of the policy. But let us take for granted that, as claimed, the father took out the policy on the life of his son. That act in this case meant at most that he told the agent to have the policy written and that he would pay the premiums. He did not, however, take out the policy by himself, but only in conjunction with his son, so that we need not express an opinion of a situation when a policy is issued without the co-operation of the insured. The contract finally consummated in this case was between

the son and the insurance company. The son reserved the right to change the beneficiary. The powers granted in the policy were those granted to the son—to have the right to the surrender value, to assign the policy, to obtain a loan thereon, to change the beneficiary. If a policy had been taken out without the clause giving a right to change the beneficiary, the rights of the parents would, of course, have been irrevocable, as already mentioned. Under the policy taken out, they had but an expectancy. They had no property right therein. Mutual Benefit Life Insurance Company v. Swett, 220 Fed. 201; Golden Star Fraternity v. Martin, 59 N. J. Law 207, 216, 35 Atl. 908. By reason of the clause giving the right to change the beneficiary, the insured had, ordinarily at least, complete control over the policy. Equitable Life Assurance Society v. Stouch, 45 Ind. App. 411; Rawls v. Penn Mutual Life Ins. Co., 253 Fed. 725. The rights granted to the son with the knowledge and agreement of his father—for the latter must in any event be held charged with knowledge of the terms of the contract—were substantially all the indicia of ownership of the policy issued pursuant to the contract, and they became effective when the policy was issued. In the absence of a principle of law of closer analogy, we might compare the situation here to one where a parent purchases property and takes title in the name of his son. Such purchase, it is said in 65 C. J. 417, "by a parent in the name of the child will be presumed to be an advancement or gift." In this case a written application for the policy was made by the son. The application was accepted by the insurance company, the contract was between them, and prima facie at least would vest all rights thereunder in the son. That gave him the rights already mentioned, the indicia of ownership, and while we cannot strictly speak of the title to the policy, the analogy to a situation where the title to property is taken is sufficiently

close so as to call, it seems, for the application of a similar rule of law. Accordingly, the testimony herein that the father took out the policy of the character here in question on the life of his son in no way whatever showed that he was the owner of the policy, but, on the contrary, under the presumption above mentioned, showed that the policy was that of the son. With the indicia of ownership as here mentioned in the son, it would seem that the delivery of the policy to the father was but a delivery to him as the natural guardian of a minor son. In any event, he accepted the policy with the conditions embodied therein and must necessarily be held to be bound thereby, unless, of course, the situation was legally changed thereafter. In other words, he accepted the policy with the condition that his right and that of his wife was merely one of expectancy, which could be wiped out at any moment. This acceptance with these conditions was equivalent to a declaration that his possession was in trust for the purpose mentioned in the policy, so that, if delivery of the policy to the son would ordinarily have been necessary in order to invest him with all the indicia of ownership and complete a gift, the acceptance of the father upon the conditions above mentioned would seem to fulfill that purpose. See 65 C. J. 277, 278. We might mention that in Grosz v. Grosz, supra, the court said that in view of the fact that the policy was nonnegotiable, possession thereof was immaterial. Of course, the father may have thought that, in view of the fact that he had possession of the policy, the power reserved by and granted to the son, namely, to change the beneficiary, could not be exercised, except with his consent. But after all, in its fundamental aspects the policy is merely a contract in writing. It came into existence by the offer made by the son, shown by his application, and by the acceptance thereof by the insurance company. Even if the father caused the ap-

plication, or offer, of the son to be made, he must be held to have done so upon the conditions contained therein, and one of the conditions was that the son should have the right to change the beneficiary. It is difficult to see how the son could be deprived of any benefits of his contract by merely withholding from him the evidence of the acceptance of his offer. The power to change such beneficiary has been treated by the courts as independent of the possession of the policy, and it is said in note 34 A. L. R. 771 as follows:

"It is uniformly held that where insured's failure to complete the change of beneficiary in his policy before his death by a return of the policy to the insurer was caused by a refusal of the beneficiary named therein to surrender the policy to him, his efforts, if otherwise in substantial compliance with the requirements imposed by statute or contract will—at least as between the persons claiming as beneficiaries—be given effect, and the equitable rights of the person designated by him as the new beneficiary will prevail over the strict legal title appearing on the face of the policy."

4. Counsel still insists that since the insurance company failed and refused to endorse a change of beneficiary on the policy, no change was effected. He insists that there is a distinction in this respect between a fraternal insurance policy, or one similar to that, and a policy of the ordinary life insurance company; that accordingly the rule laid down in the case of Brotherhood of L. F. & E. v. Ginther, 35 Wyo. 244, 248 Pac. 852, 252 Pac. 1026, which involved a fraternal life insurance policy, is not in point. Counsel considers this distinction of crucial and controlling importance herein, for he states that if this case involved a fraternal or similar insurance policy "this suit would never have been brought by the writer in the trial court, much less a rehearing asked for in the supreme court." This statement accords with the fact that so much stress was laid on this point on the original hearing of this

case, and it implies a fair and frank admission that, unless he is right on this point, the plaintiffs ought not to recover herein and that a new trial would subserve no good purpose. In the view which we have taken, and now take, of the case, we see no good reason why we should not accept counsel's statement and admission as correct. But in doing so the result is inescapable that the petition for rehearing herein must be denied and the original opinion herein must stand, for the distinction which counsel has sought to make, as above mentioned, between fraternal insurance policies and ordinary policies of insurance, which, as in the case at bar, reserve the right to change the beneficiary, does not exist. No such distinction has been, and none, we think, can be, pointed out. Whatever difference there may have existed in the past in the holdings of the courts on that point, or may still exist, the rule as stated in the Ginther case is gradually becoming the recognized rule of American jurisprudence. Some of the cases specifically discuss the point of distinction and hold that there is none. Wentworth v. Equitable Life Assurance Society, 65 Utah 581, 238 Pac. 648; Mutual Life Ins. Co. v. Lowther, 22 Colo. App. 622, 126 Pac. 882; Love v. Clune, 24 Colo. 237, 50 Pac. 34; New York Life Insurance Co. v. Rose, 70 Cal. App. 175, 233 Pac. 343; Rossman v. Ins. Co., 127 Md. 689, 96 Atl. 875; Ann. Cas. 1918C 1047. In a number of other cases, involving an ordinary life insurance policy, the principle of the Ginther case was applied or was held to apply, some of them citing cases involving fraternal insurance and old line insurance indiscriminately. The rule was stated in Brajovich v. Metropolitan Life Ins. Co., 189 Minn. 123, 248 N. W. 711, involving an ordinary life insurance policy, thus:

"Where, as here, the insured has the unrestricted right to change the beneficiary and has done substantially all that he is required to do to effect such change,

the change becomes effective notwithstanding the fact that the insurance company has lost the instrument executed by the insured or has failed or refused to indorse such change upon the policy. In such case equity will consider that done which should have been done by the insurance company."

The rule is supported by numerous authorities, some of which are the following, all involving an ordinary policy of insurance and not fraternal insurance: Hancock Mut. Life Ins. Co. v. White, 20 R. I. 457, 40 Atl. 5; Brown v. Home Life Ins. Co., 3 F. (2d) 661; McDonald v. McDonald, 212 Ala. 137, 102 So. 38, 36 A. L. R. 761 and cases cited; Metropolitan Life Ins. Co. v. Olsen, 81 N. H. 143, 123 Atl. 576, 32 A. L. R. 1472; Taff v. Smith, 114 S. C. 306, 103 S. E. 551; Philadelphia Life Ins. Co. v. Mooney, 117 N. J. Eq. 448; 176 Atl. 166; Reliance v. Bennington Ins. Co., 142 Md. 390; 121 Atl. 369; New York Life Ins. Co. v. Cook, 237 Mich. 303; 211 N. W. 648; Metropolitan Life Ins. Co. v. Lewis, (La. App.) 142 So. 721; Kimball v. Nat. L. & Acc. Ins. Co., 8 La. App. 228; Brajovich v. Metropolitan L. Ins. Co., 189 Minn. 123; 248 N. W. 711; Catham Phoenix Nat. B. & T. Co. v. Travellers Ins. Co., 232 App. Div. 598; 251 N. Y. S. 43; White v. White, 194 N. Y. S. 114; Hall v. Prudential Ins. Co., 132 Misc. 162; 229 N. Y. S. 228; State Mut. L. Ins. Co. v. Bessett, 41 R. I. 54; 102 Atl. 727; Farley v. Bank, 250 Ky. 150; 61 S. W. (2d) 1059; Baley v. Prudential Life Ins. Co., 263 N. Y. S. 244; Mutual Life Ins. Co. v. Burger, (Mo. App.) 50 S. W. (2d) 765. Many other cases might be cited. See Am. Digest 'Insurance' sec. 587; 37 C. J. 585; 14 R. C. L. 1392; Joyce on Insurance (2d ed.) sections 746, 751; Couch, Ency. of Insurance Law, Sec. 324. The case of Supreme Council v. Behrend, 247 U. S. 394, 62 L. Ed. 1182, 38 Sup. Ct. 522, 18 A. L. R. 392, relied on by counsel, is in no way in conflict with this rule. It is true that the court there mentioned a difference between ordinary life insurance and fraternal insurance,

but an examination of the case discloses clearly that reference was made merely to the rule mentioned in note 36 A. L. R. 771; Couch, Ency. of Insurance Law, Sec. 313; 14 R. C. L. 1388, namely, that the right to change the beneficiary under a mutual benefit certificate exists, though no reservation to that effect has been made, while in the case of ordinary insurance policies, such change cannot be made unless the right thereto has been reserved. We might mention incidentally that counsel contends that not even the Utah case of Wentworth v. Equitable Life Assurance Soc., supra, is in point here, for the reason that the insurance company actually endorsed the change of beneficiary on the policy. But counsel has overlooked the fact that this was done after the death of the insured, and added nothing to the right of the substituted beneficiary. Unless the latter had a definite, fixed right, either at law or equity, at the time of the death of the insured, he or she would have none at all, for whatever rights the respective parties had, either at law or equity, vested at that time which could not be changed by any subsequent act of the insurance company. 37 C. J. 580-581; McDonald v. McDonald, supra; Langdeau v. John Hancock Mutual L. Ins. Co., 194 Mass 58, 80 N. E. 452, 18 L. R. A. N. S. 1190; Chartrand v. Brace, 16 Colo. 19, 26 Pac. 152.

For the reasons pointed out, the petition for rehearing herein must be denied.

*Rehearing denied.*

KIMBALL, CH. J., and RINER, J., concur.