### INDEPENDENT LIFE AND ACCIDENT INSURANCE CO.
#### v. MITCHELL, et al.

No. 27638.

Circuit Court, Volusia County.

October 24, 1958.

Raymond, Wilson, Karl & Fink, Daytona Beach, for plaintiff in interpleader.

Charles E. Booth, Daytona Beach, for Betty Jane Mitchell.

Maurice Wagner and Richard D. Bertone, Daytona Beach, for Orville Vendler, as Administrator of the Estate of Raymond Lee Vendler, deceased.

HORACE D. RIEGLE, Circuit Judge.

This is a case where Raymond Lee Vendler, ("Raymond" hereafter), a minor aged 19, bought two life insurance policies on November 25, 1957, #4409944-A and #4409944-B, from the Independent Life and Accident Insurance Company, on his own life, paying therefor the total initial premium of $1.01 and naming therein as the beneficiary the defendant Betty Jane Mitchell ("Betty" hereafter). Three days later Raymond was accidentally killed in an automobile accident. Thereafter Betty filed her claim for the benefits under the policies in the amount of $6,000. Orville Vendler, as Administrator of the Estate of Raymond Lee Vendler, also claimed the benefits under the policies on the ground that Betty lacked an insurable interest in the estate of the decedent, and on the further ground that the beneficiary secured the position of beneficiary by fraud and deceit. Thereupon, the insurance company duly filed its interpleader suit in this court. Interpleader was granted and the insurance company paid into the registry of the court the proceeds of the insurance policies.

The defendant Betty in her answer, claims the proceeds as the named beneficiary. The defendant Orville Vendler, as Administrator of the Estate of Raymond Lee Vendler, in his answer, claims the proceeds of the policies on two grounds—*first*, that the minor had no authority to name a beneficiary and that the proceeds of the insurance therefore inured to the benefit of the estate of the minor; *second*, that the defendant Betty, during the lifetime of the minor, claimed that the minor was the father of her child, and that she threatened him with criminal prosecution unless he married her and made her the beneficiary of these policies.

The question whether or not an infant can name a beneficiary in an insurance policy is an interesting one. Under the Pennsylvania rule referred to in 14 A.L.R. 2d, page 376, Krise v. Lycoming Trust

Company (1928), 11 Pa. D & C 411, it is held that the naming of a beneficiary is testamentary in character and since, under the Pennsylvania law, a minor cannot make a will, the naming of a beneficiary is void. However, in Florida, a minor over the age of 18 can make a will, and in this case the minor at the time of buying the insurance policies was 19 years of age, so that if we should apply the Pennsylvania rule to the facts in the case at bar we would find that the designation of Betty as beneficiary would be entirely valid under the Pennsylvania rule.

In Novosel v. Sun Life Assurance Co. of Canada, a Wyoming case cited in 55 P. 2d 302, a life insurance policy was issued on the life of a minor, naming his parents as beneficiaries, the father paying the premium. Thereafter, the minor married, and, while still a minor, changed the beneficiary to his wife. While he was still a minor, the insured died. The court held that the change of beneficiary was valid.

To the same effect is Dryman v. Liberty Life Insurance Company, 216 S.C. 177, 57 S.E. 2d 163, 14 A.L.R. 2d 371, which held—

"The insured was a minor, and the respondent takes the position, as a sustaining ground, that he was not competent to effect change of beneficiary in his policy of insurance.

"He had the same capacity to effect a change of beneficiary that he possessed when he first procured the policy and designated the respondent as the beneficiary. The capacity of a minor to effect a change of beneficiary in an insurance policy is recognized in the cited case of Novosel v. Sun Life Assurance Company."

In Wainwright Trust Co. v. Prudential Life Insurance Co., 80 Ind. App. 37, 134 N.E. 913, cited in 14 A.L.R. 2d 376, it was held that the administrator of an insured who died in infancy could not avoid the designation of a beneficiary and still treat the contract of insurance as in other respects binding on the company. The court there said—

"It is averred in the complaint that appellant disaffirmed that part of the insurance contract which made Margaret Inman the beneficiary, so notified both appellees, and demanded, first, of appellee insurance company the amount due on the policy, and afterwards, when the money had been paid to the guardian, made demand of it therefor. 22 Cyc. 598, states the rule to be that: 'A contract of life insurance is not binding on an infant, but such contract is voidable only and not void.'

"This rule is followed in this court in the case of Shroyer v. Pittenger, 31 Ind. App. 158, 67 N.E. 475, where the court says: 'The better reasoning supports the rule that no contract of an infant is void because of his nonage, but all such contracts are voidable only.'

"In order, therefore, to avoid it, there must be a rescission. But it must be a rescission of the whole contract, and this is the effect of a disaffirmance of the voidable part of a contract. This rule is thus stated in Rice v. Boyer, 108 Ind. 472, 9 N.E. 420, 58 Am. Rep. 53: 'That, where the voidable act of an infant is disaffirmed, it avoids the contract ab initio, is fully approved. If this is the law, then, when the appellee repudiated his contract, he destroyed it for all purposes. It no longer bound him, nor could he take any benefit from it.'

"See also, Shrock v. Crowl, 83 Ind. 243; 22 Cyc. 616.

"Appellant, as administrator of the estate of the insured, can have no greater right than the insured would have. Having disaffirmed, it can have no right of action on the contract disaffirmed. If it be said that the partial disaffirmance was without force, then appellant must accept the contract as a whole, and, as the estate was not the beneficiary, it still has no right of action."

The weight of the authorities seems to be that an infant's contract is not void but voidable only, upon his election to rescind, or upon the election of his personal representative to rescind, but neither he, nor his personal representative, may rescind a part but not all of the contract. If the contract is rescinded, the contract must be rescinded as a whole. He cannot claim the benefits and rescind a part.

In this case the petition for interpleader alleges that the administrator of the estate of the minor claims the proceeds of the policies and this is admitted in the answer of the administrator. The administrator in his answer further lays claim to the proceeds of the insurance policies, and on cross-examination, at trial, reaffirmed the contract. It therefore affirmatively appears that the administrator has not rescinded the insurance contracts but has affirmed the same and therefore is bound by all the terms thereof.

The administrator further claims, however, that the other claimant, Betty, by fraud and undue influence upon the minor, caused him to name her as beneficiary of the policies, and by threats of criminal prosecution coerced him into so naming her as beneficiary. It is alleged that Betty accused him of being the father of her child —born during her marriage to another man—and threatened to bring criminal prosecution against him unless he married her and made her the beneficiary of the insurance policies.

It is clear from the evidence that the deceased minor was unable or unwilling to assimilate an academic education. He could read sufficiently to read the road signs. He had a driver's license. He was a good automobile mechanic and earned $50 to $60 a week. There is no evidence that his mentality was such that he was easily imposed upon.

The evidence is convincing that he was treated very well by the claimant and her family, that he lived with that family, slept with one of Betty's brothers much of the time, ate his meals with the family and was treated as a member of the family.

The administrator and his wife base their claim of fraud and threats upon very unconvincing recitations of alleged statements of the boy and upon some four or five alleged threatening letters to the boy which were not produced in evidence.

The last of the alleged letters was supposed to have been received by the boy in Covington, Kentucky, from Betty and written from Daytona Beach between November 10th and 19th, 1957. This testimony must be rejected, as the evidence is clear that Betty and her mother and one brother went to West Virginia in the middle of October of that year, because Betty's father suddenly became ill in West Virginia and was taken to a hospital. They stayed in West Virginia for several weeks and then went to Covington a day or so before Raymond was buried. Betty's other brother went to Covington from Daytona Beach with Raymond on November 10th, 1957, and they returned to Daytona Beach on or about November 20th, 1957. Since this accounts for the entire Mitchell family, it is clear that no such letter could have been written in Daytona Beach by any of them. Further, it is clear that neither Betty nor any of her family knew anything about the insurance policies, until long after Raymond's death.

The Mitchell family left Florida in October of 1957 (more than a month before Raymond bought the policies) and never saw him thereafter. Indeed, if anyone were trying to get money out of an individual, it seems doubtful to the court that they would be satisfied by the purchase of life insurance on the life of a young man aged 19 for which he paid the total premium of $1.04 weekly. The chance of realizing anything under such an arrangement would have been exceedingly remote had it not been for the unforeseeable accident which took the young man's life three days after taking out the policies. Instead of the Mitchells trying to get any money from Raymond the evidence is overwhelming that for much of the time they supplied him with free room and board.

The court is convinced from the evidence that Raymond and Betty were planning on being married. They both went to New Smyrna Beach on October 10th, 1957, and had their pre-marital blood tests made, as required by Florida law. The official certificates issued by the Florida State Board of Health as to such pre-marital examinations were introduced in evidence. Their intended marriage was postponed because of the sudden illness of Betty's father in West Virginia, which necessitated the trip referred to above.

This is not a case such as Beatty v. Strickland (Fla.), 186 So. 532, where a married man changed the beneficiary of a life insurance policy from his wife (the natural object of his bounty) to his mistress.

In the case at bar, both Betty and Raymond were free to marry, they were engaged and they had had their blood tests. As stated in Miller v. Gulf Life Insurance Company (Fla.), 12 So. 2d 127, she had an insurable interest in Raymond's life. There was and is nothing improper or irregular in a man's taking out a life insurance policy and making it payable to his fiancée.

Strange as it may seem, after observing the witnesses on the witness stand and hearing the testimony, this court is fully convinced that none of the Mitchell family felt any resentment or antagonism whatever toward Raymond. The court is convinced that there were no arguments, no threats, no urging on of any marriage. The court believes that both the Mitchell and Vendler families, before the death of Raymond, accepted as a fact Raymond's fatherhood of the child, but as far as the Mitchell family was concerned nothing was to be made of it or done about it. The fatherhood of the child is not material to this cause, except to the extent that it might be claimed to be the basis for threats or undue influence.

The weight of the evidence shows clearly that the Mitchell family took no financial advantage of Raymond. The financial advantage was all with Raymond, as he lived at their house and ate his meals with them much of the time. He never contributed anything by way of room and board and, in fact, they never asked him to do so. Raymond did, however, just before the Mitchell family left to go to the father who was ill in the hospital, give to Mrs. Mitchell the sum of $50 for her trip, which is the only evidence of any money or other thing of value going from the minor to the Mitchell family.

The court therefore finds that the equities of this cause are with the defendant, Betty Jane Mitchell, and against the defendant, Orville Vendler, as Administrator of the Estate of Raymond Lee Vendler, deceased.

It is accordingly ordered, adjudged and decreed that the defendant Betty Jane Mitchell is entitled to the balance of the proceeds of the life insurance policies now held in the registry of the court, the attorney fees for the plaintiff in interpleader and the filing fees having been heretofore deducted from such sum, less the unpaid court costs for court reporter services in the amount of $45.50.

It is further ordered, adjudged and decreed that the clerk of the court shall, 10 days after the date of this decree, from the said balance of the proceeds of the life insurance policies, pay the sum of $45.50 to Gail S. Lynch, court reporter, and shall pay the sum then remaining to Betty Jane Mitchell and her attorney of record, Charles E. Booth.