2002 WY 152

Gary HOBLYN and Michelle Hoblyn, Appellants (Plaintiffs),

v.

Margurette JOHNSON, Chuck Johnson, Matthew Wayne Davis, Loucin Port Davis, Officer Crumpton, Greg Bybee, Ken Peterson, the Laramie County Sheriff's Department and the State of Wyoming, Appellees (Defendants).

No. 01–169.

Supreme Court of Wyoming.

Oct. 9, 2002.

Rehearing Denied Nov. 5, 2002.

Bernard Q. Phelan of Phelan–Watson Law Office, Cheyenne, Wyoming, Representing Appellants.

Misha E. Westby and Ryan T. Schelhaas of Hirst & Applegate, P.C., Cheyenne, Wyoming, Representing Appellees Johnson.

Curtis B. Buchhammer and Loretta R. Green of Buchhammer & Kehl, P.C., Cheyenne, Wyoming, Representing Appellees Davis.

Hoke MacMillan, Attorney General; John W. Renneisen, Deputy Attorney General; and John D. Rossetti, Senior Assistant Attorney General, Representing Appellees Crumpton, Bybee, and State of Wyoming.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] The teenage daughter of Appellants Gary and Michelle Hoblyn (the parents) accused her father of abuse. While the charges were being investigated, the parents took the daughter to stay temporarily with her grandparents in Nebraska but would not permit her to take her horse. The daughter undertook efforts, with the assistance of a state brand inspector, to obtain possession of her horse. Though the father was later found not guilty of abuse, the daughter did not return home. The parents sued the grandparents, the neighbors, the brand inspector, the Laramie County sheriff's department, and others for various conspiracy and individual claims including tortious interference with the parent-child relationship, deprivation of constitutional rights under color of state law, intentional infliction of emotional distress, larceny, trespass, harassment, and defamation. The district court dismissed the tortuous interference claim against the grandparents for lack of jurisdiction, and it dismissed the remainder of the claims by summary judgment. We affirm.

## ISSUES

[¶ 2] We rephrase the issues as follows:

I. Under the facts of this case, should Wyoming adopt the cause of action for intentional interference with the parental relationship?

II. Did the district court err in granting the grandparents' motion to dismiss the parents' claim of intentional interference with the parental relationship for lack of *in personam* jurisdiction?

III. Did the state brand inspector, assisted by deputies of the Laramie County sheriff's department, violate the parents' Fourth Amendment rights by entering their property without a warrant to inspect and transfer the daughter's horse to a new owner?

IV. Must a person seek psychological care or submit expert testimony to prove severe emotional distress?

V. May a tort action be premised on statutory criminal larceny?

VI. In Wyoming, is a civil action for harassment provided by statute?

VII. How is the jurisdictional amount in controversy to be determined?

VIII. Was the neighbor's comment, reported by the newspaper, that the parents were "not nice people" sufficient by itself to establish a prima facie case of defamation?

## FACTS

[¶ 3] Pursuant to our standard of review for summary judgments, we consider the facts from the vantage point most favorable

---

\* Chief Justice at time of oral argument

to the parents, as the party opposing the motions, awarding them all the favorable inferences which may be drawn from those facts. *S & G Investors, LLC v. Blackley*, 994 P.2d 941, 943 (Wyo.2000).

[¶ 4] In October 1998, the sixteen-year-old daughter accused her father of physical abuse. The Department of Family Services (DFS) suggested a "cooling off" period, and the parents took the daughter from Cheyenne to North Platte, Nebraska, to stay approximately one month with her paternal grandmother, Margurette Johnson, and step-grandfather, Chuck Johnson (the grandparents). The grandmother asked the parents to allow the daughter to have her horse while she stayed in Nebraska. They refused though the daughter was the horse's legal owner. The daughter contacted Matthew Davis, her neighbor from Cheyenne, for advice. Mr. Davis spoke with Greg Bybee, a state brand inspector, who apparently later contacted the daughter. On November 13, 1998, the grandparents drove the daughter to a truck stop near Burns, Wyoming, so she could meet with the brand inspector. Although the grandparents and Mr. Davis and his wife (the neighbors) were present at the truck stop, the daughter met with the brand inspector alone at a separate table. During the meeting, the daughter signed papers transferring ownership of her horse to Ken Peterson.

[¶ 5] At seven o'clock the next morning, the brand inspector and Deputies Fanning and Crumpton from the Laramie County sheriff's department went to the parents' Cheyenne home. The brand inspector had requested assistance from the sheriff's department, and the deputies were sent in response. Mr. Peterson also went to the parents' home with a pickup truck and a horse trailer. While everyone else waited on the county road off the property, Deputy Fanning knocked on the front door of the residence. No one answered, and Deputy Fanning joined the others on the county road to wait and see if anyone would appear. After approximately twenty to thirty minutes, the brand inspector entered the property from behind the residence and went to a fenced area with some outbuildings. He opened a wire gate, entered an enclosure, and identified a horse he found there as being the same horse the daughter had transferred to Mr. Peterson the night before. The brand inspector led the horse off the property and loaded it into the horse trailer, and Mr. Peterson drove away. Later that day, the brand inspector met Mr. Peterson at a welding shop and completed the paperwork transferring ownership of the horse back to the daughter. The neighbors then took the horse to the daughter in Nebraska.

[¶ 6] The father was criminally charged for allegedly hitting the daughter and found not guilty after a March 1999 jury trial.[1] The neighbors kept in contact with the daughter and grandparents through personal visits, letters, and telephone calls. The grandparents brought the daughter to Cheyenne on several occasions to visit the neighbors and did not advise the parents. The daughter bought a truck from the neighbors, and the grandparents helped her purchase a horse trailer.

[¶ 7] The grandparents started temporary guardianship proceedings in Nebraska as required by the school district where the daughter was enrolled. The parents reportedly did not show up at the hearing, and the matter was not pursued further.

[¶ 8] At the time of the father's trial, the mother gave the daughter a necklace as a birthday gift which the daughter returned to her after the trial. A short time later, the grandmother and the daughter obtained protective orders from the District Court of Lincoln County, Nebraska to preclude all contact by the parents. Instead of returning home, the daughter remained with her grandparents, completed high school, and obtained a job as a horse trainer.

[¶ 9] From the record, it appears the parents never reported the daughter's horse was stolen nor made any larceny or trespass complaints. Further, they filed no legal action in either Nebraska or Wyoming to regain custo-

---

1. It is unclear from the record precisely what offense was charged against the father and whether it was a misdemeanor or a felony. However, because the father was found not guilty, this information is of minimal significance.

dy of their daughter from the grandparents, nor did they appear in the Nebraska district court to contest the protective orders.

[¶ 10] In January 2000, the parents filed a civil complaint, subsequently amended, alleging various causes of action against the grandparents, the neighbors, Deputy Crumpton, the brand inspector, Ken Peterson, and the Laramie County sheriff's department. The combined damages were alleged to be "in excess of $500,000.00 plus punitive damages in an amount sufficient to deter the defendants and others."[2] The parents appeal the district court's order by which all the causes of action were dismissed.

## STANDARD OF REVIEW

[¶ 11]

The standard of review applied by this Court in reviewing the granting of summary judgment is well-settled. "When a motion for summary judgment is before the supreme court, we have exactly the same duty as the district judge; and, if there is a complete record before us, we have exactly the same material as did he. We must follow the same standards. The propriety of granting a motion for summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in affidavits, depositions and other proper material appearing in the record. We separate the formal and pretended from the genuine and substantial so only the latter may be considered in eliminating the burden of a formal trial if only questions of law are left to decide; there must be no issue of material fact to decide. A material fact, expressed in various ways, is one having legal significance which would in a given case control the legal relations of the parties; one upon which the outcome of the litigation depends in whole or in part; one on which the controversy may be determined; one which will affect the result or outcome of the case depending upon its resolution; or one which constitutes a part of the plaintiff's cause of action or the defendant's defense. Summary judgment affords an opportunity for prompt disposition of a lawsuit in its early stages, permitting an end to unfounded claims and avoiding the expense of a full-fledged trial to both litigants and the state's judicial machinery." *Reno Livestock Corp. v. Sun Oil Co. (Delaware)*, 638 P.2d 147, 150–51 (Wyo.1981) [ (citations omitted) ].

*McLean v. Hyland Enterprises, Inc.*, 2001 WY 111, ¶ 14, 34 P.3d 1262, ¶ 14 (Wyo.2001). If we can uphold summary judgment on the record presented under any proper legal theory, we will. *Hulse v. First Interstate Bank of Commerce–Gillette*, 994 P.2d 957, 959 (Wyo.2000).

## DISCUSSION

### A. Intentional Interference with the Parental Rights

[¶ 12] In the first cause of action, the parents claimed the grandparents individually, and in conspiracy with the neighbors, interfered with their parent-child relationship by harboring the daughter and inducing her to remain out of their custody. The district court dismissed this count on the grandparents' motion claiming lack of *in personam* jurisdiction. It granted the neighbors' motions for summary judgment because the cause of action is not recognized in Wyoming.

[¶ 13] The Restatement (Second) of Torts, entitled "Causing Minor Child to Leave or not to Return Home," provides: "One who, with knowledge that the parent does not consent, abducts or otherwise compels or induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent." [3]

---

**2.** The original complaint set out damages in excess of $100,000 plus punitive damages. The amended complaint added the harassment and defamation claims and increased the damages request to $500,000.

Restatement (Second) of Torts § 700 at 505 (1977).

■ [¶ 14] In *Stone v. Wall*, 734 So.2d 1038 (Fla.1999), the Florida Supreme Court reviewed the history of the action and thoughtfully analyzed the effects of recognizing the tort. We acknowledge, as referenced by the *Stone* court, that the majority of states has recognized this tort and Wyoming is not yet one of them. *Stone*, 734 So.2d at 1042 n. 6.[3]

[¶ 15] In *Cosner v. Ridinger*, 882 P.2d 1243 (Wyo.1994), we declined to recognize the tort when a noncustodial parent asserted it alleging deprivation of visitation. This court reviewed the Wyoming statutes which give priority to the child's best interests as well as the public policy behind those statutes and concluded recognition of the cause of action in the context of custody and visitation could negatively impact children by encouraging more litigation in already volatile family circumstances. Our reasoning was greatly influenced by the policy considerations raised in *Larson v. Dunn*, 460 N.W.2d 39 (Minn.1990), as follows:

"For the good of our children, the law should seek to promote such harmony as is possible in families .... At a minimum, the law should not provide a means of escalating intrafamily warfare....

"It is clear that this tort would be used as a new weapon in such disputes.... The interest in compensation should not outweigh the effects of bitter accusations on ... children....

"Creating this tort would create a new wrong. It would place innocent children in the middle of a vigorous, probably vicious, lawsuit ...."

*Cosner*, 882 P.2d at 1247 (quoting *Larson*, 460 N.W.2d at 45–46 (citations omitted)).

■ [¶ 16] The intentional interference with parental rights cause of action is commonly referenced in divorce situations where the noncustodial parent, with or without collusion with relatives, absconds with the children and hides from the custodial parent. *See Marshak v. Marshak*, 226 Conn. 652, 628 A.2d 964 (1993); *Weirich v. Weirich*, 796 S.W.2d 513 (Tex.App.1990). The elements of the tort include compelling or inducing a

---

3. Footnote six reads:

Sixteen state supreme courts have recognized the tort of intentional interference with the custodial relationship or abduction: *Anonymous v. Anonymous*, 672 So.2d 787 (Ala. 1995); *Borer v. American Airlines*, 19 Cal.3d 441, 138 Cal.Rptr. 302, 563 P.2d 858, 865 n. 3 (1977); *D & D Fuller CATV Constr., Inc. v. Pace*, 780 P.2d 520 (Colo.1989); *Shields v. Martin*, 109 Idaho 132, 706 P.2d 21 (1985); *Montgomery v. Crum*, 199 Ind. 660, 161 N.E. 251 (1928); *Wood v. Wood*, 338 N.W.2d 123 (Iowa 1983); *Murphy v. I.S.K. Con. of New England, Inc.*, 409 Mass. 842, 571 N.E.2d 340 (1991); *Brown v. Brown*, 338 Mich. 492, 61 N.W.2d 656 (1953); *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983); *Howell v. Howell*, 162 N.C. 283, 78 S.E. 222 (1913); *Pickle v. Page*, 252 N.Y. 474, 169 N.E. 650 (1930); *Clark v. Bayer*, 32 Ohio St. 299 (1877); *McBride v. Magnuson*, 282 Or. 433, 578 P.2d 1259 (1978); *Bedard v. Notre Dame Hosp.*, 89 R.I. 195, 151 A.2d 690 (1959); *Silcott v. Oglesby*, 721 S.W.2d 290 (Tex.1986); *Kessel v. Leavitt*, 204 W.Va. 95, 511 S.E.2d 720 (1998), *cert. denied*, 525 U.S. 1142, 119 S.Ct. 1035, 143 L.Ed.2d 43 (1999). Two other state supreme courts have implied that they would have recognized this cause of action if the question were properly before them. *See Marshak v. Marshak*, 226 Conn. 652, 628 A.2d 964 (1993); *Finn v. Lipman*, 526 A.2d 1380 (Me.1987). In addition, an intermediate appellate court in at least two other states [has] approved the tort: *Mathews v. Murray*, 101 Ga.App. 216, 113 S.E.2d 232 (1960); *Spencer v. Terebelo*, 373 So.2d 200 (La.Ct.App.1979); *see also* Kristin A. Wentzel, Note, *In the Best Interests of the Child? Minnesota's Refusal to Recognize the Tort of Intentional Interference with Custodial Rights*, 14 Hamline L.Rev. 257, 265 n. 83 (1990) (courts in 23 states and the District of Columbia have recognized this tort).

Two state supreme courts have refused to recognize a claim for tortious interference with the custodial parent-child relationship based upon their concern that tort recovery and its accompanying litigation would be detrimental to the best interests of the child. *See Larson v. Dunn*, 460 N.W.2d 39 (Minn.1990); *Zaharias v. Gammill*, 844 P.2d 137 (Okla.1992); *see also Cosner v. Ridinger*, 882 P.2d 1243 (Wyo.1994) (implying that it would reject tort if it were properly before the court). In two other states, Illinois and Missouri, there is a split in authority in the intermediate-level appellate courts regarding whether the cause of action should be recognized. *Compare Whitehorse v. Critchfield*, 144 Ill.App.3d 192, 98 Ill.Dec. 621, 494 N.E.2d 743 (1986) *with Dymek v. Nyquist*, 128 Ill.App.3d 859, 83 Ill.Dec. 52, 469 N.E.2d 659 (1984); *compare Politte v. Politte*, 727 S.W.2d 198 (Mo.Ct.App.1987) *with Kramer v. Leineweber*, 642 S.W.2d 364 (Mo.Ct.App.1982).

child to leave the parents and refusing to return the child. Those elements are not present in this case, which more closely resembles a voluntary foster care placement.

[¶ 17] The father's affidavit reflects, at the time of the daughter's abuse accusations against him, the DFS suggested a "cooling off" period during which the daughter would be temporarily placed outside the home. The parents asked the paternal grandmother and step-grandfather to take their daughter to live with them for approximately one month, and the grandparents agreed. At a minimum, the placement effected *de facto* custody in the grandparents, implicitly giving them the necessary authority to address the daughter's day-to-day needs. Such a voluntary placement agreement usually remains in effect until revoked because, generally speaking, the voluntary transfer of parental rights is only effective due to the parental consent and is, therefore, revocable at will. 3 Donald T. Kramer, Legal Rights of Children § 29.02 (2d ed.1994). Thus, the daughter must be returned to the parents, if the parents request, unless there is some authority to continue custody under the state's juvenile law. *Id.*

[¶ 18] The evidence submitted in response to the motions for dismissal and summary judgment does not indicate the parents ever revoked their grant of temporary custody or requested that their daughter be returned. The father stated in his affidavit, "[d]uring the trial, I, of course, was not allowed contact with my daughter as a condition of my release on bond." We can reasonably infer that the contact prohibition was not limited to just the period of the trial but actually began when the father was released on bond and remained in place through the conclusion of the trial. Therefore, we can further infer that, during this time frame, the daughter could not return to the family home unless the father left.

[¶ 19] However, nothing in the record suggests, after the father's acquittal, the parents ever revoked the grant of temporary custody or demanded the daughter's return or the grandparents ignored or rebuffed requests of this nature. In fact, the only evidence of the parents even asking to visit their daughter was the mother's purported request for the daughter to come home for the 1998 Thanksgiving holiday. Even though the grandmother allegedly refused to permit this visitation, the parents did not respond at any time thereafter by revoking the voluntary placement or taking legal action to regain physical custody of their daughter.

[¶ 20] The father contends, after he was acquitted, he went to Nebraska to see his daughter only to have the daughter and the grandparents call the police to intervene and prevent contact. The record reflects that the District Court of Lincoln County, Nebraska issued *ex parte* domestic abuse protection orders on March 23, 1999, precluding the parents from contacting or communicating with the grandmother and the daughter. These orders stated, as provided in Neb.Rev. Stat. § 42–925 (1998),[4] that a respondent has the right to file a request for a show cause hearing to demonstrate why the order should not remain in effect. The Nebraska statute requires the court to hold the hearing within thirty days of receipt of the request, if timely made. Section 42–925.[5] The parents do not contend they were not properly served with

4. Section 42–925 provides in part:

If such ex parte order is issued to the respondent, the court shall forthwith cause notice of the petition and order to be given the respondent stating that, upon service on the respondent, the order shall remain in effect for a period of one year and, if the order grants temporary custody, that such custody shall not exceed the number of days specified by the court unless the respondent shows cause why the order should not remain in effect. The court shall also cause to be served upon the respondent a form with which to request a show-cause hearing. If the respondent wishes to appear and show cause why the order should not remain in effect, he or she shall affix his or her current address, telephone number, and signature to the form and return it to the clerk of the district court within five days after service upon him or her. Upon receipt of the request for a show-cause hearing, the court shall immediately schedule a show-cause hearing to be held within thirty days after the receipt of the request for a show-cause hearing and shall notify the petitioner and respondent of the hearing date.

5. Section 42–925 directs the request be made within five days after service of the show cause form on the respondent.

the orders. However, despite the parents' alleged emotional distress caused by separation from their daughter and the prohibition of contact with her, the record contains no request for such a hearing or evidence of an attempt to contest the issuance of the orders and gain access to their daughter.

[¶ 21] Likewise, the parents failed to demonstrate an effort to utilize the Wyoming court system to regain custody of their daughter before she turned eighteen years of age. They filed no legal action in either Nebraska or Wyoming for her physical return subsequent to the March 1999 abuse trial. Instead, they waited until January of 2000 to file this lawsuit to seek money damages alleging the grandparents, whom they had asked to care for the daughter, in conspiracy with the neighbors, intentionally interfered with their parental authority. The primary goal of this lawsuit does not appear to be the daughter's best interests. Instead, it appears to be a means for the parents to vindicate themselves and retaliate against the grandparents, the neighbors, and others who assisted the daughter while she was placed out of her home. *See Politte v. Politte,* 727 S.W.2d 198 (Mo.Ct.App.1987).

[¶ 22] The parents' evidence fails to persuade this court that recognition of the intentional interference with parental rights tort in these circumstances will advance the best interests of children and families. Even if we were inclined to recognize the tort now, the parents have failed to establish a prima facie case that the elements of the cause of action were present.

[¶ 23] The district court also concluded it had no *in personam* jurisdiction over the grandparents regarding this claim. We need not address the jurisdictional issue as we decline to apply the cause of action in these circumstances.

[¶ 24] We affirm the district court's dismissal of this claim against the grandparents and its grant of summary judgment to the neighbors. This holding does not necessarily preclude future recognition of the cause of action under different circumstances.

### B. Claims Related to Ownership and Possession of the Horse

[¶ 25] The parents claim the grandparents, Mr. Peterson, Deputy Crumpton, and the brand inspector, under color of state law, unlawfully acted individually and in conspiracy with each other by express and implied agreement with regard to the daughter's horse to deprive the parents of their constitutional rights provided by the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The district court granted summary judgment to all defendants holding the horse was subject to the brand inspector's jurisdiction, the brand inspection statutes diminish the expectation of privacy, and therefore there was no Fourth Amendment claim.

[¶ 26] The parents also alleged the same defendants conspired to commit larceny by taking or leading away property—the horse—in their lawful possession. The district court dismissed this count with prejudice because the daughter owned the horse and was denied possession; therefore, no claim of larceny could be maintained for the taking of the horse from the parents' property. The district court further found larceny does not exist in civil law and conversion was the appropriate civil remedy, which was not pleaded.

[¶ 27] In a further related allegation, the parents accused the same defendants of conspiring to enter their real property without consent and against their will and, in the course of the trespass, causing damages. The district court found a question of material fact existed as to whether a trespass occurred. However, it dismissed the cause of action with prejudice because, even if the issue was resolved in favor of the parents, the damages evidence did not meet the court's minimum jurisdictional limits.

[¶ 28] Pursuant to a different legal analysis, we reach the same resolution as the district court on these causes of action.

[¶ 29] The dispute over the daughter's horse is at the heart of these actions. The parents concede the horse was legally the daughter's and titled in her name. However, they also contend, as parental cus-

todians of the animal, they could refuse to permit the daughter to take the animal to Nebraska where they had voluntarily placed her. We believe their contention is unfounded.[6]

"As a general rule any property acquired by the child in any way except by its own labor or services belongs to the child, and not to the parent." [46 C.C. 1314].... It furthermore goes without saying that a parent cannot deprive a child of its property except pursuant to law (31 C.J. 1011), and the fact that in this instance the father had the property in question assessed as his property could not affect the title of the children. In *Banks v. Conant*, 96 Mass. 497, 14 Allen (Mass.) 497, it was said: "In consideration of the duty which the law imposes on a father to furnish adequate support to his child during infancy, the services of the child during that period are due to the father, and, if they are rendered to a third person, the right of the father to recover the value thereof is clear and indisputable. But this is the extent of the father's right. He has no title to the property of the child, nor is the capacity or right of the latter to take property or receive money by grant, gift or otherwise, except as a compensation for services, in any degree qualified or limited during minority. *Whatever therefore an infant acquires which does not come to him as a compensation for services rendered, belongs absolutely to him, and his father cannot interpose any claim to it, either as against the child, or as against third persons who claim title or possession from or under the infant.*"

*Kreigh v. Cogswell*, 45 Wyo. 531, 21 P.2d 831, 833 (1933) (emphasis added). Though issued almost seventy years ago, this opinion still provides an accurate statement of the law. *See also* 1 Donald T. Kramer, Legal Rights of Children §§ 8.01–8.03 (2d ed.1994); *Fare v. Scott K.*, 24 Cal.3d 395, 155 Cal.Rptr. 671, 595 P.2d 105, 110–11 (1979);[7] 67A C.J.S. *Parent and Child* § 113 (1978).

■ [¶ 30] Despite the general rule, parents do retain property rights in certain items they provide their children for the purpose of support, maintenance, or education such as clothing and books. 1 Kramer, Legal Rights of Children, *supra* at § 8.12; 67A C.J.S. *Parent and Child, supra* at § 119. It is uncontroverted the daughter's paternal grandfather[8] gave the horse to her as a gift, the horse was titled in her name, and it was not necessary for her support or maintenance. As a matter of law, the horse belonged to the daughter, and the parents had no implied authority over it simply because of their proprietary interest in the premises on which it was located.

■ [¶ 31] The parents do not dispute the daughter wanted her horse returned to her personal possession and had not appointed them to act as agents for her in any capacity. The parents' agency on behalf of the daughter cannot be inferred from the mere existence of the family relationship. Rather, the daughter must duly authorize the parents to act as her agent. 67A C.J.S. *Parent and Child, supra* at § 119; *Angus v. London*, 92 Cal.App.2d 282, 206 P.2d 869, 870 (1949). In effect, an involuntary bailment was created when the parents took the daughter to live elsewhere and kept her horse.

---

6. Issues of alleged parental conversion of property or other torts against the child are not raised in this appeal, nor are issues raised of the proper role of parental discipline or the common law defense of parental authority and discretion. *See Dellapenta v. Dellapenta*, 838 P.2d 1153 (Wyo. 1992); *Keser v. State*, 706 P.2d 263 (Wyo.1985). On appeal, we do not consider issues not raised in the district court except for those issues which are jurisdictional or fundamental in nature. *Simek v. Rocky Mountain, Inc.*, 977 P.2d 687, 689 (Wyo.1999).

7. Common authority over personal property may not be implied from the father's proprie-

tary interest in the premises. Neither may it be premised on the nature of the parent-child relation.

Juveniles are entitled "to acquire and hold property, real and personal," (*Estate of Yano* (1922) 188 Cal. 645, 649, 206 P. 995, 997); and "a minor child's property is his own ... not that of his parents" (*Emery v. Emery* (1955) 45 Cal.2d 421, 432, 289 P.2d 218, 225).
(Some citations omitted.)

8. The daughter was given the horse by her paternal biological grandfather, not by Chuck Johnson, her paternal step-grandfather.

A constructive or involuntary bailment arises where the person having possession of a chattel holds it under such circumstances that the law imposes on him the obligation of delivering it to another, where a person has lawfully acquired possession of personal property of another otherwise than by a mutual contract of bailment, or where a person has lawfully acquired the possession of personal property of another and holds it under circumstances whereby he should, on principles of justice, keep it safely and restore it or deliver it to the owner.

8 C.J.S. *Bailments* § 15 at 237 (1988).

[¶ 32] Such a bailment was at issue in *Moore v. Moore*, 835 P.2d 1148 (Wyo. 1992), a divorce case in which the wife left her horses on the ranch awarded to the husband because she had no place to keep them. *See also Horn v. State*, 556 P.2d 925 (Wyo.1976). The *Moore* facts are different from those in this case to the extent the husband had no say regarding the animals remaining on his property. In the instant case, the horse was on the property to begin with, the parents took the owner elsewhere to live, and they did not permit the horse to go with her. These distinctions do not change the involuntary character of the bailment, and, as we noted in *Moore*, the involuntary bailee has an absolute duty to return the property. *Moore*, 835 P.2d at 1153.

"Where the person in possession has committed no independent act of conversion, a rightful possession in him continues as such until it is transformed into a wrongful detention by a demand for the property and a refusal to deliver it." [65 C.J. 43–45.]

.... And it is generally held that ordinarily a demand should be made by a bailor upon the bailee for the return of his goods before an action for conversion against the bailee will lie.

*Vissenberg v. Bresnahen*, 65 Wyo. 367, 202 P.2d 663, 669–70 (1949).

[¶ 33] Viewing the facts in the light most favorable to the parents, we will assume they did nothing inconsistent with their daughter's ownership interests in the horse until they refused her request to re-turn it. The Restatement (Second) of Torts provides:

(1) Except as otherwise agreed, a conditional vendor or lessor of a thing who is entitled to immediate possession thereof, or a successor to his legal interest in the thing, is privileged, at a reasonable time and in a reasonable manner, to enter land in the possession of the vendee or lessee, for the purpose of taking possession of the thing and removing it from the land.

. . . .

(3) The privileges stated in Subsection[ ](1) . . . are also available to

. . .

(c) a bailor of a thing who by reason of the termination of the bailment is entitled to the immediate possession of the thing.

1 Restatement (Second) of Torts § 183 at 332 (1965). As noted in the comments, absent an express agreement, the law infers consent of the bailee to entry by the bailor who is entitled to possession of the thing by reason of the termination of the bailment. *Id.*, § 183 at 333. The Restatement (Second) of Torts likewise extends a privilege to the bailor to retrieve the property:

(1) One is privileged to enter land in the possession of another, at a reasonable time and in a reasonable manner, for the purpose of removing a chattel to the immediate possession of which the actor is entitled, and which has come upon the land otherwise than with the actor's consent or by his tortious conduct or contributory negligence.

1 Restatement (Second) of Torts, *supra*, § 198 at 361. Comment a of this subsection explains that application of § 198 is limited to those situations where the actor, as against all persons, is entitled to immediate possession of the chattel both at the time when the chattel is placed on the land and when the actor seeks to enter and reclaim it. *See Salisbury Livestock Company v. Colorado Central Credit Union*, 793 P.2d 470 (Wyo. 1990); *see also Sammons v. American Automobile Association*, 912 P.2d 1103 (Wyo. 1996). It follows that, once the parents refused the daughter's request for the return of her horse, she was privileged to enter

their real property at a reasonable time and in a reasonable manner to take the horse. No reason exists why she could not accomplish the same through an agent.

[¶ 34] The daughter also had the right to transfer her bailed property, and the parents' arguments to the contrary are unfounded.

> It must not be overlooked that minors have ... the capacity to take, but their capacity to give is limited. They have capacity to contract, at least when of sufficient age to understand what they are doing; but, in general, they have the right to repudiate their contracts. Thus they may contract ... but the contract is, ordinarily, voidable at their election.

*Novosel v. Sun Life Assur. Co. of Canada*, 49 Wyo. 422, 55 P.2d 302, 305–06 (1936); *see also Jankovsky v. Halladay Motors*, 482 P.2d

9. (a) Except as hereafter provided, it is unlawful for any person, firm, partnership, corporation, or association to sell and deliver or to remove or cause to be removed in any way from any county in Wyoming to any other county, state or country, any livestock unless each animal has been inspected for brands and ownership at the time of delivery or removal by an authorized Wyoming brand inspector and a proper certificate of inspection or clearance has been issued.

(b) Transporting livestock across state lines without first having had such inspection and having obtained such certificates is prima facie evidence of intent to avoid inspection and to steal, take and carry away the animals and is punishable as provided in W.S. 6–3–402.

10. (a) Except as otherwise provided, before removing any livestock from any county of Wyoming, the person selling or intending to cause removal shall notify the inspector of the date of the intended removal and the time and place when and where the required inspection for brands and ownership can be made. The inspection shall be made within a reasonable time prior to shipment. The person in charge of the livestock shall hold the livestock at the place designated until the livestock have been inspected and an official certificate of inspection is issued. The person in charge shall render the inspecting officer such assistance as is practicable while the required inspection is being made.

11. (a) A brand inspector may inspect livestock being transported, trailed, pastured or confined at his discretion, to determine ownership, without an inspection fee.

129 (Wyo.1971). The parents place significant emphasis on the appearance of the sale as a sham. Even if we assume this is true, it has absolutely no bearing on the resolution of this appeal. The daughter had the ability to sell her horse, and, with the brand inspector's assistance, she completed the paperwork to accomplish the transfer of the title.

[¶ 35] With regard to the claims against the brand inspector, his actions were consistent with his statutory authority. Pursuant to Wyo. Stat. Ann. § 11–20–203 (LEXIS 1999)[9] (amended 2001), Wyo. Stat. Ann. § 11–20–205(a) (LexisNexis 2001),[10] Wyo. Stat. Ann. § 11–20–214(a) (LexisNexis 2001),[11] and 1 Restatement (Second) of Torts, *supra*, § 211 at 398,[12] the brand inspector had authority to enter the parents' land to retrieve the daughter's horse for transfer to Mr. Peterson. His actions constituted neither trespass[13] nor larceny.[14]

12. A duty or authority imposed or created by legislative enactment carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority in so far as the entry is reasonably necessary to such performance or exercise, if, but only if, all the requirements of the enactment are fulfilled.

13. (a) A person is guilty of criminal trespass if he enters or remains on or in the land or premises of another person, knowing he is not authorized to do so, or after being notified to depart or to not trespass. For purposes of this section, notice is given by:

(i) Personal communication to the person by the owner or occupant, or his agent, or by a peace officer; or

(ii) Posting of signs reasonably likely to come to the attention of intruders.

Wyo. Stat. Ann. § 6–3–303(a) (LexisNexis 2001).

14. (a) A person who steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor is guilty of larceny.

(b) A bailee, a public servant as defined by W.S. 6–5–101(a)(vi) or any person entrusted with the control, care or custody of any money or other property who, with intent to steal or to deprive the owner of the property, converts the property to his own or another's use is guilty of larceny.

. . . .

(d) Conduct denoted larceny in this section constitutes a single offense embracing the separate crimes formerly known as larceny, larceny by bailee or embezzlement.

Wyo. Stat. Ann. § 6–3–402(a), (b), (d) (LexisNexis 2001).

[¶ 36] The claims against Officer Crumpton are also specious in light of the uncontested facts because he never entered the parents' property. Though Officer Fanning did enter the property, he did so in a reasonable way in order to notify the parents that the brand inspector was there to secure the horse. Pursuant to Wyo. Stat. Ann. §§ 11–18–112 [15] and 18–3–606 [16] (LexisNexis 2001) and 1 Restatement (Second) of Torts, *supra* at § 211, these actions were reasonable; legally authorized; and, again, constituted neither trespass nor larceny.

[¶ 37] The parents also allege the grandparents, the neighbors, and Mr. Peterson were part of a conspiracy to trespass and commit larceny. These causes of action fail for the same reasons the underlying claims against the brand inspector and Officer Crumpton failed. It is ironic, albeit immaterial, that the parents' actions appear to better fit the statutory larceny by bailee definition than the actions of any of the parties they have accused.

## C. Intentional Infliction of Emotional Distress/Proof of Severity

[¶ 38] In their third cause of action, the parents alleged the grandparents and neighbors had, individually and in conspiracy with one another, subjected them to severe emotional harm by their outrageous conduct. The district court granted summary judgment holding there was no evidence the parents' emotional distress was severe and they failed in their burden to establish a genuine issue of material fact. On appeal, the parents contend the district court dismissed their allegations because they did not seek psychological care or submit expert testimony to prove the severity of their injuries. This portrayal of the district court's action is inaccurate. The district court actually concluded:

8. In order to make a prima facie showing of intentional infliction of emotional distress the [parents] must show severe emotional distress. The [parents] have asserted emotional distress but have no evidence that such distress is severe. There is no evidence that [they] have sought professional help, only that they are pained by these events. A party moving for summary judgment carries the burden of dispelling the existence of material fact thereby shifting the burden to the nonmoving party to produce evidence raising a genuine question of material fact. The record contains only bald statements that they have suffered severe emotional distress with no supporting evidence. Therefore, Count II[I] of the amended complaint is dismissed with prejudice.

[¶ 39] This court recognized intentional infliction of emotional distress as a cause of action in *Leithead v. American Colloid Company*, 721 P.2d 1059, 1065–67 (Wyo.1986), which explained:

Section 46 of the Restatement, Second, Torts (1965), places several limits on the action for intentional infliction of emotional distress. It provides:

"Outrageous Conduct Causing Severe Emotional Distress

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

Outrageous conduct is defined in comment "d" of the Restatement as conduct which goes beyond all possible bounds of decency, is regarded as atrocious, and is

---

15.　All federal authorities authorized, and the various inspectors of this state, may call upon any sheriff or peace officer in any county in this state to assist them in the discharge of their duties and those peace officers shall assist them when so requested. The federal inspector has the same power to enforce the laws of this state as the various inspectors of the state when authorized as aforesaid and engaged in the discharge of their official duties. Any person refusing to comply with the orders of such officer or federal inspector shall be punished as provided in W.S. 11–1–103.

16.　Each county sheriff and deputy shall preserve the peace in the respective counties and suppress all affrays, riots, unlawful assemblies and insurrections. Each sheriff or deputy sheriff may call upon any person to assist in performing these duties or for the service of process in civil and criminal cases or for the apprehension or securing of any person for felony or breach of peace.

utterly intolerable in a civilized community. Severe emotional distress is defined in comment "j" as distress which is so severe that no reasonable man could be expected to endure it.

.... Comment "h" to § 46 of the Restatement, Second, Torts (1965) states:

"Court and jury. It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability."

....

... "The actor is never liable ... where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress." Restatement, Second, Torts § 46, comment "g." ....

....

... Comment "j" of § 46 of the Restatement, Second, Torts states:

....

"It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed."

See also Worley v. Wyoming Bottling Company, Inc., 1 P.3d 615, 628 (Wyo.2000). The father's affidavit provides the only evidence of the severity, and he simply maintains they experienced uncomfortable and unpleasant feelings of various descriptions.[17] There is no evidence of the impact of this alleged distress on their lives such as missed work, inability to sleep or engage in hobbies and activities previously enjoyed, diminished ability to socialize or handle the necessary functions of everyday life, or memory loss. Certainly, the need for professional counseling

could be evidence of the severity of the emotional distress, but it is not a required element. Contrary to the parents' representation, the district court did not find their proof failed because they did not seek treatment from mental health professionals. Instead, the court found the parents' statements that they experienced offensive feelings and emotions without further evidence of the effect on their lives were insufficient to establish a prima facie case of severe emotional distress. This decision is squarely within the district court's gatekeeping function, and we affirm.

### D. Civil Harassment Cause of Action Based on Criminal Stalking Statute

[¶ 40] The parents also claimed the right to pursue a civil harassment cause of action against the neighbors founded on the criminal stalking provisions of Wyo. Stat. Ann. § 6–2–506 (LexisNexis 2001) as referenced in Wyo. Stat. Ann. § 1–1–126 (LexisNexis 2001). The district court dismissed this cause on two alternative grounds: (1) The claim as pleaded under § 6–2–506 was not actionable in Wyoming; and, (2) even if it was actionable, like the intentional infliction of emotional distress count, it lacked merit because there was no evidence of substantial emotional distress. We affirm the district court's dismissal of this claim based upon a failure of proof of substantial emotional distress. Consequently, we need not address whether a harassment cause of action can be pursued under the stalking statute §§ 6–2–506 and 1–1–126.

### E. Defamation

[¶ 41] Finally, the parents contend they were defamed when a comment made by their neighbor, Mrs. Davis, that they were "not nice people" was reported in a newspaper article. The district court, without additional explanation and citing Wilder v. Cody Country Chamber of Commerce, 868 P.2d 211 (Wyo.1994), dismissed this cause of action holding the statement did not rise to the level of defamation. We conclude this was the correct result because the statement did not constitute defamation

---

**17.** By way of illustration, the affidavit refers in part to: anger, fear, sadness, hatred, remorse, obsession, depression.

per se; therefore, proof of special damages was required, and the parents failed to carry this burden.

"A defamatory communication is one which tends to hold the plaintiff up to hatred, contempt, ridicule or scorn or which causes him to be shunned or avoided; one that tends to injure his reputation as to diminish the esteem, respect, goodwill or confidence in which he is held." *Tschirgi v. Lander Wyoming State Journal*, 706 P.2d 1116, 1119 (Wyo.1985). Accord *Century Ready–Mix Co. v. Campbell County School Dist.*, 816 P.2d 795, 799 (Wyo.1991).

*Wilder*, 868 P.2d at 224. Defamation per se means "a statement which is defamatory on its face and, therefore, actionable without proof of special damages." 50 Am.Jur.2d *Libel and Slander* § 134 at 430 (1995). The only statements classified as defamatory per se or damaging on their face, and which therefore do not require proof of special harm, are those which impute (1) a criminal offense; (2) a loathsome disease; (3) a matter incompatible with business, trade, profession, or office; or (4) serious sexual misconduct. 3 Restatement (Second) of Torts, *supra* at §§ 570, 575. It is apparent Mrs. Davis' statement does not fall into any of these per se categories.

[¶ 42] The Restatement (Second) of Torts provides: "One who publishes a slander that, although not actionable per se, is the legal cause of special harm to the person defamed, is subject to liability to him." 3 Restatement (Second) of Torts, *supra*, § 575 at 197. In comment b of § 575, special harm is defined as "loss of something having economic or pecuniary value." The parents provided no proof of special harm or special damages. The record contains no prima facie showing of economic or pecuniary damage caused by the "not nice people" statement.

[¶ 43] Because the statement was not considered defamation per se and no economic damages were shown, the district court properly determined there was no defamation. This is consistent with *Wilder* in which we concluded, although the statements complained of might be disparaging and offensive, they were not actionable as defamation

per se because they were not defamation per se and no damages were shown. We affirm the dismissal.

[¶ 44] For the reasons expounded above, we conclude the district court properly dismissed all the parents' claims.

[¶ 45] Affirmed.