2003 WY 50

**Joe BERTAGNOLLI, Appellant (Plaintiff),**

v.

**Max LOUDERBACK and Larry Westbrook, Appellees (Defendants).**

No. 02–65.

Supreme Court of Wyoming.

April 21, 2003.

⟨⟩934(1)

Michael R. O'Donnell and Rhonda Sigrist Woodard of Woodard & O'Donnell, P.C., Cheyenne, Wyoming; and Sharon Rose of Lavery & Rose, P.C., Evanston, Wyoming, Representing Appellant.

Ford T. Bussart and Marvin L. Tyler of Bussart, West & Tyler, P.C., Rock Springs, Wyoming, Representing Appellees.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

KITE, Justice.

[¶ 1] Joe Bertagnolli was injured while working in General Chemical Corporation's trona mine in Sweetwater County. He filed suit against his co-employee supervisors, Max Louderback and Larry Westbrook, alleging they required him to work in an area of the mine generally known to be extremely dangerous and refused his request to "lock out," or turn off, the power to the shuttle belt machine (shuttle belt). The district court granted the supervisors' motion for summary judgment concluding they did not have knowledge of an unguarded sheave wheel which was the specific instrumentality of Mr. Bertagnolli's injury and, therefore, as a matter of law, they could not be liable for the injuries under Wyo. Stat. Ann. § 27–14–104(a) (LexisNexis 2001). We find questions of material fact existed regarding the supervisors' knowledge of the general risks of working near the shuttle belt and whether their actions met the requirements of the statute and constituted willful and wanton misconduct and, therefore, reverse.

## ISSUE

[¶ 2] The parties agree only one issue is presented on appeal: Did the district court err in granting summary judgment in favor of the co-employee supervisors?

## FACTS

[¶ 3] "Pursuant to our standard of review for summary judgments, we recite the facts from the vantage point most favorable to the plaintiffs, as the party opposing the motions, awarding them all the favorable inferences which may be drawn from those facts." *Andersen v. Two Dot Ranch, Inc.*, 2002 WY 105, ¶ 3, 49 P.3d 1011, ¶ 3 (Wyo. 2002); *see also S & G Investors, LLC v. Blackley*, 994 P.2d 941, 943 (Wyo.2000). Evidence submitted by Mr. Bertagnolli in opposition to the supervisors' summary judgment motion consisted of lengthy affidavits, deposition excerpts, and exhibits which set forth his version of the events. The following summary of the facts is drawn from those materials.

[¶ 4] On November 13, 1996, Mr. Bertagnolli was instructed by his section foreman and direct supervisor, Mr. Westbrook, to shovel ore rubble in the west end of the shuttle belt area of the mine also known as the 702 area. Mr. Bertagnolli had worked at the mine for about two years but had never before worked in the shuttle belt area.

[¶ 5] The shuttle belt moves raw ore from the level of the mine on which mining occurs to lower levels where other equipment moves it to the surface. It resembles an open rail car with a long, continuous belt on top and travels up and down a track approximately forty to fifty feet in length by means of a steel cable attached to both ends of the car. The cable makes a large loop around several pulley wheels called "sheave wheels." The cable and sheave wheels are approximately twelve inches above the track. The cable runs through an electric motor called a "tugger" which can pull the shuttle belt in either direction on the rail track. An operator controls the movements of the shuttle belt from a level of the mine below where the shuttle belt is located. By maneuvering the shuttle belt back and forth, the operator aligns it over bins which receive ore from the bottom of the shuttle belt and then transfer the ore to a set of feeders that move it to another series of belts and on to the surface. In the east end, workers are protected from the movements of the steel cable by a series of steel walkway plates positioned over the cable. There is also a steel guardrail in the east end to keep workers away from the shuttle belt and its moving parts. On the west end, however, the steel cable is exposed, the sheave wheels are unguarded, no steel plates are in place over the cables, and there is very little clearance between the shuttle belt and the walls of the mine. Workers in the west end are unprotected from the dangers presented by the shuttle belt and its moving parts.

[¶ 6] When Mr. Bertagnolli was instructed to shovel the shuttle belt area clean, he and Mr. Westbrook were standing in the west end. Mr. Bertagnolli asked whether he was expected to do the work while the shuttle belt was operating, and Mr. Westbrook responded in the affirmative. Mr. Bertag-

nolli then requested the belt be "locked out" so it could not be turned on while he was in harm's way. Mr. Westbrook left to discuss the matter with Mr. Louderback, the shift supervisor. The supervisors came back together, and Mr. Louderback advised Mr. Bertagnolli the belt would not be locked out. Mr. Bertagnolli stated he would not work in the area unless the belt was locked out, and Mr. Louderback told him, if he did not do the job, he could be fired. Mr. Bertagnolli asked that the union steward be contacted to resolve the matter. Mr. Louderback instructed Mr. Westbrook to notify the union steward, and then they both left the area. Mr. Bertagnolli, believing he could be fired for refusing to work, started to shovel the ore debris in the west end of the shuttle belt area while he waited for the union steward to arrive.

[¶ 7] John "Bud" Dolce, one of Mr. Bertagnolli's crew mates, walked by the shuttle belt area a couple of hours later. He called to Mr. Bertagnolli and told him he was shoveling in "an unsafe area that needed to be locked out." Mr. Bertagnolli told Mr. Dolce he had been ordered by Mr. Louderback to do this job and he had requested a union steward. About an hour or so later, while Mr. Bertagnolli was working approximately five feet behind the rail car, the car started to travel back towards him, and the cable beneath his feet began to move. He threw his shovel to the left and tripped when he stepped back to grab his wheelbarrow. He stuck his right foot behind him to catch his balance, and his boot caught in the pinch point between one of the steel cables and the sheave wheel. The wheel completely severed the back portion of Mr. Bertagnolli's right foot. Over the following three years, Mr. Bertagnolli underwent eleven surgeries to repair his foot. In the end, these efforts were unsuccessful, and in October of 1999 his right leg was amputated just below the knee.

[¶ 8] Mr. Bertagnolli filed suit against the supervisors under § 27–14–104(a) alleging they willfully, wantonly, and intentionally ordered him to work in close proximity to operating equipment with known dangers of amputation and death and for refusing to turn off the electricity to the equipment after being specifically requested to do so. The supervisors moved for summary judgment contending they could not be liable for Mr. Bertagnolli's injuries because they did not know the sheave wheel that severed the back portion of his foot was unguarded. For purposes of the summary judgment, the parties orally stipulated that the legal standard for co-employee liability should be based on § 27–14–104(a) and the willful and wanton misconduct standard. In their briefs submitted to this court, they agree, under § 27–14–104(a), liability is imposed on co-employees who commit intentional acts or willful and wanton misconduct.

[¶ 9] After the summary judgment hearing, the district court granted the supervisors' motion concluding Mr. Bertagnolli presented no evidence that they had knowledge prior to his accident that the sheave wheel was unguarded. Consequently, the supervisors could not be found to have violated § 27–14–104(a) or the willful and wanton misconduct standard and, at most, were negligent. This appeal followed.

## STANDARD OF REVIEW

[¶ 10] When a motion for summary judgment is before this court, assuming there is a complete record, we have exactly the same duty and materials as did the district court and must follow the same standards. *Hoblyn v. Johnson*, 2002 WY 152, ¶ 11, 55 P.3d 1219, ¶ 11 (Wyo.2002). The propriety of granting summary judgment depends upon the correctness of a court's dual findings that there is no genuine issue as to any material fact and the prevailing party is entitled to judgment as a matter of law. *Id.* This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all the favorable inferences which may be drawn from the facts contained in affidavits, depositions, and other materials appearing in the record. *Id.*

[¶ 11] The party moving for summary judgment bears the initial burden of establishing a prima facie case for a summary judgment. If the movant carries this burden, the party opposing the summary judgment must come forward with specific facts to demonstrate that a genuine issue of

material fact does exist. *Eklund v. PRI Environmental, Inc.,* 2001 WY 55, ¶ 10, 25 P.3d 511, ¶ 10 (Wyo.2001). A material fact has been defined as a fact upon which the outcome of the litigation depends in whole or in part. *Hoblyn,* 2002 WY 152, ¶ 11, 55 P.3d 1219, ¶ 11.

## DISCUSSION

### A. Co-employee Liability

[¶ 12] In order to determine whether a disputed issue of material fact existed in this case, we must first clarify the standard for co-employee liability against which the evidence is to be measured. Wyoming's co-employee liability law under the worker's compensation statutes has evolved over the past several decades. This court's discussion in *Mills v. Reynolds,* 837 P.2d 48, 52 (Wyo. 1992), includes a concise review of the relevant historical developments. The Wyoming Constitution provides employers who contribute to the worker's compensation fund immunity from liability for employees injured on the job. Wyo. Const. art. 10, § 4.

[¶ 13] However, in 1974, this court recognized and adopted the common law doctrine that co-employees could be liable when their own negligence caused injury to other employees. *Markle v. Williamson,* 518 P.2d 621, 624 (Wyo.1974). In 1975, the legislature provided co-employees immunity when they were "acting within the scope of their employment unless the employees [were] grossly negligent." 1975 Wyo. Sess. Laws ch. 149, § 1 (§ 27–312(a)). Shortly thereafter, the legislature substituted the words "culpably negligent" for "grossly negligent." 1977 Wyo. Sess. Laws ch. 142, § 1 (§ 27–312(a)) (renumbered § 27–12–103(a)). In interpreting these provisions, this court determined the legislature's qualified grant of co-employee immunity, excepting circumstances of culpable negligence, was constitutional and did not violate Article 10, Section 4 of the Wyoming Constitution because the amount of

damages recoverable was not limited. Instead, the statute limited only the causes of action available for recovery. *Meyer v. Kendig,* 641 P.2d 1235 (Wyo.1982).

[¶ 14] In 1986, the legislature repealed § 27–12–103(a) and recreated it as § 27–14–104(a) to provide for total immunity of co-employees. 1986 Wyo. Sp. Sess. Laws ch. 3, § 3.[1] In *Mills,* we held § 27–14–104(a) unconstitutional as it violated the equal protection clause of Article 3, Section 27 of the Wyoming Constitution by treating similarly situated people differently and violated Article 1, Section 8 of the Wyoming Constitution by denying access to courts when it granted co-employees complete immunity from suits, including immunity for intentional acts and for willful and wanton misconduct. *Mills,* 837 P.2d at 49, 54. In reaching this conclusion, we stated:

> [W]e do not perceive that complete immunity for co-employees who were acting within the scope of their employment was the least onerous means by which the objective of the Act could be achieved. Section 27–14–104(a) precluded employees from bringing suit against co-employees who committed intentional torts while they were acting within the scope of their employment. In essence, that provision permits an employee to intentionally harm a co-employee without being concerned about civil liability. While such immunity may slightly decrease the number of lawsuits filed by employees and increase the number of employees who will be guaranteed compensation, it severely burdens the State's undeniable interest in prohibiting an individual from committing an intentional tort without the possibility of liability. Harmony in the work place may actually be enhanced if an employee knows that the worker next to him will be legally accountable for some of his actions, and, even though the parties have not presented facts concerning insurance costs and the financial status of the worker's compensa-

---

1. Section 27–14–104(a) (emphasis added) as recreated in 1986 read as follows:

   (a) The rights and remedies provided in this act for an employee and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and reme-

dies against any employer making contributions required by this act, *or his employees acting within the scope of their employment,* but do not supersede any rights and remedies available to an employee and his dependents against any other person.

tion fund, we would be hard pressed to hold that those objectives could be attained only under a scheme which provided complete immunity to employees.

In summary, the legislature's grant of complete immunity to co-employees, which includes immunity for intentional acts and for willful and wanton misconduct, infringed upon the fundamental right to access to the courts. Such an infringement triggers application of the strict scrutiny test. Under that test, we are unable to identify a compelling state interest which would permit complete immunity for co-employees.

*Id.* at 55 (citations & footnote omitted).

[¶ 15] In response to the *Mills* decision, the legislature amended the co-employee liability statute in 1993. This version of the statute was in effect on the date of Mr. Bertagnolli's accident and remains so today:

(a) The rights and remedies provided in this act for an employee including any joint employee, and his dependents for injuries incurred in extrahazardous employments are in lieu of all other rights and remedies against any employer and any joint employer making contributions required by this act, or their employees acting within the scope of their employment **unless the employees intentionally act to cause physical harm or injury to the injured employee,** but do not supersede any rights and remedies available to an employee and his dependents against any other person.

Section 27–14–104(a) (emphasis added); *see also* 1993 Wyo. Sess. Laws ch. 47, § 1. Since its passage, we have referenced this version of the statute as it relates to the interpretation of the phrase "intentionally act to cause physical harm or injury" on only one occasion, in *Harbel v. Wintermute,* 883 P.2d 359 (Wyo.1994), and stated:

The exclusive remedy provisions of the Worker's Compensation Act do not provide immunity to a co-employee who commits intentional acts or willful and wanton misconduct. *Mills v. Reynolds,* 837 P.2d 48, 55 (Wyo.1992). **See Wyo. Stat. § 27–14–104(a) (permitting co-employee tort ac-**

**tion when "employees intentionally act to cause physical harm or injury to the injured employee ....").** Therefore, under the Worker's Compensation Act, [the employee] was permitted to sue [the co-employees] to recover damages for personal injury suffered in a work-related accident that allegedly resulted from the culpable negligence of his co-employees. *Copp v. Redmond,* 858 P.2d 1125, 1126–27 (Wyo.1993) (holding that for claims accruing between July 1, 1987 and February 18, 1993, proof of culpable negligence was required for co-employee tort action). *See* Wyo. Stat. § 27–12–103(a) (1983) (repealed 1986) (establishing culpable negligence as standard of negligence for co-employee litigation under Worker's Compensation Act).

883 P.2d at 363 (emphasis added).[2] This discussion implies that the amended standard of "intentionally act to cause physical harm or injury" equates to willful and wanton misconduct. We continue to believe the concept of willful and wanton misconduct has essentially the same legal effect as the statutory language "intentionally act to cause physical harm or injury." Well before the 1993 amendment to § 27–14–104(a), this court expressly defined willful and wanton misconduct in terms of intentional actions:

Willful and wanton misconduct is the **intentional** doing of an act, or an **intentional** failure to do an act, in reckless disregard of the consequences and under circumstances and conditions that a reasonable person would know, or have reason to know that such conduct would, in a high degree of probability, result in harm to another.

*Weaver v. Mitchell,* 715 P.2d 1361, 1370 (Wyo.1986) (emphasis added); *see also Mayflower Restaurant Company v. Griego,* 741 P.2d 1106, 1115 (Wyo.1987). In addition, one of the bases of the *Mills* decision was the conclusion that allowing immunity for intentional acts and willful and wanton behavior violated the constitution, and the legislature's response to that decision was the adoption of

2. This case went on to hold the claim was precluded because the employee failed to comply with the Wyoming Governmental Claims Act, a separate statutory provision having no application to Mr. Bertagnolli's claim.

the statute granting immunity except for intentional acts. *Mills,* 837 P.2d at 55. Our conclusion that the statutory grant of immunity covers all but intentional acts and willful and wanton misconduct is consistent with the parameters of statutory construction:

> "All statutes are presumed to be enacted by the legislature with full knowledge of the existing state of law with reference thereto and statutes are therefore to be construed in harmony with the existing law, and as a part of an overall and uniform system of jurisprudence, and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to the decisions of the courts."

*Fosler v. Collins,* 13 P.3d 686, 689 (Wyo.2000) (quoting *Voss v. Ralston,* 550 P.2d 481, 486 (Wyo.1976)); *see also Andersen,* 2002 WY 105, ¶ 22, 49 P.3d 1011, ¶ 22.

[¶ 16]  Mr. Bertagnolli argues the key factors in finding co-employee liability under § 27-14-104(a) are a co-employee with (1) knowledge of the hazard or serious nature of the risk involved, (2) responsibility for the injured employee's safety and work conditions, and (3) willful disregard of the need to act despite the awareness of the high probability that serious injury or death may result. Our jurisprudence in this area is consistent with these factors. In *Calkins v. Boydston,* 796 P.2d 452 (Wyo.1990), we held the injured employee must demonstrate his co-employees had actual knowledge of the dangerous condition which caused his injury. Mr. Calkins worked for an oil well service company and was injured when his leg got caught in the unguarded drive shaft of a pump truck. He sued the company secretary-treasurer, Marinell Boydston, and her son Gerald Boydston, the president of the company. The evidence demonstrated Mr. Calkins had used the pump truck in the past and had informed the Boydstons that the pump needed to be replaced. However, he provided no evidence the Boydstons knew the drive shaft was unguarded or the pump was dangerous; therefore, summary judgment was proper.

[¶ 17]  In *Smith v. Throckmartin,* 893 P.2d 712 (Wyo.1995), this court emphasized that the co-employee's actions must be willful and not merely inadvertent in nature. In that case, Mr. Throckmartin was Mr. Smith's supervisor, and, on the day of the accident, they were working together loading sand into a truck. Mr. Throckmartin operated a backhoe while Mr. Smith tamped and broke up clumps of sand in the truck bed with a metal bar. By Mr. Smith's own admission, Mr. Throckmartin hit the metal bar with the backhoe bucket by mistake causing Mr. Smith to fall from the truck bed and incur serious head and spinal injuries. This court again required the plaintiff to provide evidence the co-employee acted with a state of mind approaching intent to do harm or committed an act of an unreasonable character in disregard of known or obvious risks so great as to make it highly probable that harm would follow. 893 P.2d at 714. Inferences from evidence of violations of safety regulations were found insufficient to raise genuine issues of material fact regarding the co-employee's knowledge of the nature of the risks, particularly when uncontroverted evidence that the co-employee lacked such knowledge was presented. *See also McKennan v. Newman,* 902 P.2d 1285, 1287–88 (Wyo.1995); *Poulos v. HPC, Inc.,* 765 P.2d 364, 366 (Wyo. 1988).

[¶ 18]  In *Case v. Goss,* 776 P.2d 188 (Wyo.1989), we reversed summary judgment in favor of certain co-employees, and the underlying facts are similar to those alleged by Mr. Bertagnolli. The plaintiff provided evidence that responsible supervisors were apprised of the dangerous condition, failed to take reasonable steps to remedy the dangerous condition, and overtly threatened to fire the reporting employee who was ultimately injured. While working at a coal mine, Mr. Case slipped on a hidden grease spot and fell onto the metal surface of the boom point sheave area of a dragline. We found evidence was provided that four co-employees had varying degrees of direct supervisory responsibility for Mr. Case's safety and working conditions, had been made aware of the dangerous condition, had refused to clean or allow Mr. Case to clean or lock out the area to lessen the danger posed, and had threatened to terminate his employment if he did not do the work as instructed.

[¶ 19] In each of these cases, we consistently held the requirements of the statute and the standards of willful and wanton misconduct were met when the evidence demonstrated the co-employee had knowledge of the dangerous condition and demonstrated a disregard of the risks through intentional acts. With this standard in mind, we now must review the evidence submitted by Mr. Bertagnolli to determine whether it was sufficient to create a genuine issue of material fact with regard to the supervisors' knowledge of the dangerous condition and whether they acted intentionally in disregard of known risks.

## B. Summary Judgment

[¶ 20] Upon review of the order granting summary judgment and the supporting opinion letter, it is evident the district court believed the only issue before it was the narrow question of whether the supervisors knew of the unguarded sheave wheel and the danger it presented. In truth, the issues presented by Mr. Bertagnolli in his complaint were much broader than simply the danger posed by the unguarded sheave wheel and, instead, included the well-known dangers associated with the larger apparatus, the shuttle belt, especially when employees were required to work in close proximity to the machine while it was energized and operational.

[¶ 21] The broad nature of Mr. Bertagnolli's negligence claim is also clear from the affidavits, deposition excerpts, and exhibits submitted in response to the supervisors' summary judgment motion which demonstrate a much more pervasive safety risk than just the unguarded sheave wheel. Mr. Bertagnolli testified in his affidavit that, on the day he was injured, he specifically asked Mr. Westbrook to lock out the shuttle belt. Mr. Westbrook reportedly asked Mr. Louderback whether the machine should be locked out while Mr. Bertagnolli worked in the west end shoveling debris. Mr. Louderback allegedly told Mr. Bertagnolli he would not allow the shuttle belt to be locked out, and Mr. Bertagnolli responded he would not work in the shuttle belt area unless the equipment was locked out because moving belts are

extremely dangerous and he did not want to be exposed to this kind of danger. Mr. Louderback purportedly threatened to fire Mr. Bertagnolli. Mr. Bertagnolli testified he requested the union steward be called because he believed the steward could determine whether his safety concerns were justified and require the shuttle belt be locked out. However, Mr. Bertagnolli also alleged he thought, while waiting for the steward's arrival, he was required to perform the assigned task or risk losing his job. Mr. Bertagnolli's affidavit also states he attended safety meetings where the supervisors were present and the lockout policy was discussed. He learned at those meetings the mine policy provided the equipment had to be locked out whenever anyone was required to work around a moving belt or other moving piece of equipment.

[¶ 22] Dean Wehr, a mine employee until 1996 and supervisor of mine maintenance from 1989 to 1994, explained in his affidavit that the shuttle belt operator controls movement of the shuttle belt from a level below where the machine is located and, while operating the machine, cannot see the shuttle belt area where Mr. Bertagnolli was working. His affidavit also stated:

18. ... [T]he policy, practice and custom at this mine, including on November 13, 1996, [understood by every worker and supervisor] was that no worker was allowed to perform maintenance on ... any parts of the Shuttle Belt unless it was locked out [because t]o do otherwise would have been a violation of the safety rules at the mine, a gross violation of long-standing custom and practice, and could expose workers to a high degree of probability of being severely injured or killed.

. . . .

20. The only time workers were allowed into the area of the Shuttle Belt was when it was locked out.... With the equipment not in operation, the extreme risk of severe injury or death ... was reduced and workers were allowed to perform maintenance and cleaning in the area.

. . . .

22. The shift supervisor and section foreman, among others, have the direct

responsibility of enforcing the policies, practices and customs of the mine regarding miner safety. They have the direct responsibility ... to make certain that none of their workers are working in the west end, or unprotected end, of the loadout area of the mine, or around the Shuttle Belt, unless the Shuttle Belt has been locked out.... This responsibility existed through my years at the General Chemical mine.

[¶ 23] Mr. Dolce, a co-worker and crew mate on the night of the accident, signed an affidavit swearing he saw Mr. Bertagnolli shoveling in the west end of the shuttle belt area, he yelled to him he was in an unsafe area that needed to be locked out, and Mr. Bertagnolli responded that Mr. Louderback had ordered him to do the work and he had requested a union steward. Mr. Dolce told Mr. Bertagnolli that he would have refused to do the work. Mr. Dolce's affidavit also states he attended meetings where the supervisors were present when the lockout policy was discussed and he learned the safety policy required the shuttle belt be locked out whenever workers were in the unprotected west end.

[¶ 24] In the supervisors' depositions, they both, albeit reluctantly, acknowledged the extremely hazardous nature of work done in and around the energized shuttle belt and their awareness of numerous ways a worker could be injured through amputation of body parts or even loss of life. However, they denied knowing the sheave wheel, which severed Mr. Bertagnolli's foot, was unguarded. They also denied they had knowledge of any company policy requiring the shuttle belt to be locked out under the circumstances which existed on the night of the accident, Mr. Bertagnolli requested a union steward, or they threatened to terminate his employment if he did not work as instructed.

[¶ 25] The supervisors argued Mr. Bertagnolli offered no evidence they had actual knowledge of the dangerous condition and presented only mere inferences drawn from alleged violations of safety policies and practices which were insufficient to create a material issue of fact in the face of their testimony they had no such knowledge. *Smith,*

893 P.2d 712. This argument fails to persuade us. It is directed at the narrow issue of the unguarded sheave wheel and ignores evidence of the general risks of working in the area of the shuttle belt. The supervisors' testimony could be interpreted by the factfinder as proving they knew of the broader dangers of the shuttle belt area. Mr. Bertagnolli is entitled to have a jury determine whether that evidence, together with the evidence presented with regard to their intentional acts, demonstrates the supervisors "**intentionally act(ed) to cause physical harm or injury**" and their actions constituted willful and wanton misconduct.

[¶ 26] We conclude the district court viewed the issues too narrowly and failed to address the evidence which created questions of fact concerning the supervisors' knowledge of the general risks posed by the shuttle belt. With this larger question in mind, we find multiple issues of material fact existed which require resolution by the fact-finder before judgment can be properly rendered in this matter. *Case,* 776 P.2d 188. Consequently, the co-employee supervisors were not entitled to judgment as a matter of law.

[¶ 27] Reversed and remanded for further proceedings consistent with this opinion.